2000 ME 47

## Awralla H. ALDUS

v.

## STATE of Maine.

Supreme Judicial Court of Maine.

Argued Nov. 1, 1999.

Decided March 14, 2000.

---

Philip C. Worden (orally), Northeast, ME, for petitioner.

David W. Crook, District Attorney, Alan Kelley, Deputy Dist. Atty., (orally) Paul Rucha, Asst. Dist. Atty., Augusta, ME, for the State.

Before WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, SAUFLEY, ALEXANDER, and CALKINS, JJ.

CALKINS, J.

[¶ 1] The State appeals from a judgment entered in the Superior Court (Kennebec County, *Studstrup,* J.) granting Awralla H. Aldus post-conviction relief and vacating Aldus's conviction for aggravated assault (Class B), *see* 17–A M.R.S.A. § 208(1)(B) (1983). The State contends that the Superior Court erred in finding that Aldus was deprived of effective assistance of counsel. We affirm the judgment.

## I. FACTS AND PROCEEDINGS

[¶ 2] Aldus, age twenty-nine years, is a native of Somalia and has lived in the United States for twelve years. She is not a citizen of the United States. She was recently divorced from her husband of eleven years. They have two children. At the time of the post-conviction hearing Aldus was in the custody of the Immigration and Naturalization Service (INS).

[¶ 3] Aldus was arrested for aggravated assault on her estranged husband on July 3, 1998. The State alleged that she went to the home where her husband and their two children resided with his girlfriend and attacked the husband with a knife. In addition to aggravated assault, Aldus was charged with three Class D offenses. She was taken to District Court on July 6, 1998, and counsel was appointed for a bail hearing. She pled not guilty on the Class D offenses; trial was scheduled; and bail was set. After spending several days in jail, Aldus posted bail and was released. She was subsequently hospitalized following a suicide attempt, and upon her release from the hospital on August 11, 1998, she was rearrested and charged with additional Class D offenses because, according to the State, she threatened her husband and his girlfriend over the telephone. She appeared in District Court on August 12, 1998, and attorney David Geller was appointed to represent her for the arraignment and bail hearing on the new charges.

[¶ 4] Aldus was unable to post the new bail, and she remained in custody. She was taken to court on August 19, which was the date set for the trial on the July 3 Class D charges and for the probable cause hearing on the aggravated assault charge.[1] She did not have an attorney because the attorney originally appointed to represent her had withdrawn due to a conflict. When Aldus arrived at court, the District Court (Waterville, *Westcott, C.J.*) appointed Geller to represent Aldus on the charges that were scheduled for trial that day. Geller met with Aldus and reviewed the charges with her.[2] He spent approximately one hour with her, not including the time spent before the judge.

[¶ 5] The prosecutor allowed Geller to review the State's file on Aldus which contained the police reports and witness statements, and Geller discussed these with Aldus. Geller asked Aldus her version of the July 3 events. Geller testified at the post-conviction hearing that Aldus told him that she had no recollection of the events because she was inebriated. According to Geller, Aldus was very upset while they were talking and said she just wanted to get it over. Aldus testified at the post-conviction hearing that she told Geller she did not stab her husband, that she had been drinking that night and did not remember everything, but she did remember that she did not stab her husband. Geller and Aldus also discussed the August 11th incident. Aldus testified that she and Geller discussed "dead time."[3] She under-

---

1. As of August 19, Aldus had not been indicted on any of the charges from July 3 or August 11.

2. The transcript reveals that after Geller spoke with Aldus, he spoke to the clerk who then notified the judge that there was an agreement that all pending matters against Aldus be continued to September 22. The judge said those matters would be set for September 22 at 1:00. The judge went on to other business and was later informed that there was a plea agreement in Aldus's cases.

3. A defendant is entitled to a deduction from a sentence for the time spent in pre-trial detention on the charges on which the defen-

dant is convicted. *See* 17–A M.R.S.A. § 1253(2) (Supp.1999). "Dead time" refers to time in jail that is not attributable to a charge on which the defendant is convicted. Geller and Aldus were apparently concerned that because Aldus had posted bail on the July 3 charges, she would not be given credit, in any sentence for the July 3 matters, for the time she was jailed on the August 11 charges, and if the July 3 cases were continued to another date, she would be "doing dead time" on the July 3 matters. As Aldus's post-conviction attorney pointed out to the court, however, the common method of resolving this problem is by "surrendering" the defendant on those charges for which she has posted

stood that if her case was continued to another day for trial, the time in jail would not count toward any eventual sentence.

[¶ 6] At some point during a conversation between Geller and the prosecutor, the prosecutor said that INS, meaning the Immigration and Naturalization Service, was looking for Aldus. The prosecutor said he did not have any more information. Geller knew from his previous representation of Aldus at the August 12 bail hearing that she was not a United States citizen and was from Somalia. Geller repeated to Aldus the information that INS was looking for her. She asked him what that meant, and he said, "I have no idea." Aldus did not ask any more questions about INS. Geller did not inquire of Aldus if she desired time to learn why INS was interested in her, and he did not indicate to her that any court action could be deferred so that she could obtain more information.

[¶ 7] Geller and the prosecutor discussed a plea agreement by which the State offered to recommend a sentence of five years, suspending all but six months, and probation for five years on the aggravated assault charge. After presenting this offer to Aldus, Geller and the prosecutor talked further, and a new plea offer was made. The second offer was a choice between two alternatives: (1) five years, suspending all but ninety days, and four years probation; or (2) five years, suspending all but six months, and four years probation, and Geller would be free to argue for less time before the judge. Aldus chose the ninety-day alternative.

[¶ 8] Geller was given a District Court form to review with Aldus. The two-page form, entitled Acknowledgment of Rights, listed the rights contained in M.R.Crim. P.

11(c)(2). Geller read the form to Aldus, filled in the blanks with Aldus's name, the charge of aggravated assault, and the maximum sentence of ten years and $20,000 fine. Aldus signed the form, which further stated that she understood all of her rights and was pleading guilty and giving up her rights. Geller also signed the form thereby asserting that he had thoroughly explained all of her rights to Aldus as well as the elements of the offense; that he believed she understood the rights; that she had the mental capacity to evaluate her rights; and had knowingly and intelligently waived them.

[¶ 9] Thereafter, Geller and Aldus went into the courtroom. The judge explained the charge of aggravated assault to Aldus who said she understood it. The court then asked Geller if he had reviewed the Acknowledgement of Rights form with Aldus, and Geller stated that he read it word for word to her. The court asked Aldus if she had any questions, and she said "No." The court asked if she understood that she was giving up her right to have the State present her case to the grand jury, and she replied that she understood. The court then instructed her to sign the Acknowledgment of Rights form if she still wanted to plead guilty. The court asked her if anyone was "forcing you to do this, or are you doing this of your own free will?" She responded, "My own free will, your Honor." The court then asked Geller if he was satisfied that Aldus understood and was entering the plea knowingly and intelligently. Geller responded in the affirmative. The judge did not address Aldus personally as to whether she understood each of the individual rights that she was giving up.[4]

---

bail so that the pre-trial detention covers all charges.

4.  In the post-conviction petition and hearing, Aldus raised the issue of the voluntariness of her plea because of the inadequacy of the Rule 11 proceeding. The Superior Court found that the failure of the District Court to address Aldus personally rendered the Rule 11 inquiry defective. This shifted the burden

to the State to demonstrate that, in spite of the Rule 11 proceeding's defects, the plea was knowing and voluntary. *See Morgan v. State,* 287 A.2d 592, 598 (Me.1972). The court found that the State met that burden and that Aldus's plea was voluntary. The State presented affidavits of witnesses to the events of July 3 which led to the aggravated assault charge. The Superior Court found: "Consid-

[¶ 10] Aldus pled guilty to aggravated assault, and the prosecutor briefly described the facts of the assault. The court asked about the knife, and the prosecutor said it had not been found. The court accepted the guilty plea, and Aldus then pled guilty to all of the pending charges from both July 3 and August 11, except a simple assault charge.[5] The State recommended a sentence on the aggravated assault count of five years incarceration with all but ninety days suspended, and four years of probation. The prosecutor listed various conditions of probation. On all other charges the State recommended a sentence of sixty days in jail, to be served concurrently with the aggravated assault sentence. The court imposed the sentence on aggravated assault and stated the probation conditions.

[¶ 11] Approximately two months after her conviction, Aldus filed a petition for post-conviction relief. She claimed that her plea was not made knowingly and voluntarily and that she was deprived of adequate assistance of counsel. Following a hearing, the Superior Court granted her petition and vacated her conviction on the aggravated assault charge. The court found that Aldus's plea was made voluntarily, but that she had been deprived of adequate assistance of counsel. The court found that Geller's inability to answer her question "clearly would call for at least a request for continuance" and that the failure to "stop and obtain the information requested by the petitioner" placed Geller's performance in representing Aldus below that of an ordinary fallible attorney because Geller knew that Aldus was not a United States citizen. The Superior Court noted that the conviction for aggravated

assault meant that Aldus was "conclusively presumed" to be deportable. *See* 8 U.S.C. § 1228 (Supp.1999). The court found that Aldus would not have entered her plea but for Geller's error in failing to call a halt in the proceedings to obtain time to answer Aldus's question.

## II. THE *STRICKLAND/HILL* TEST AND STANDARD OF REVIEW

[¶ 12] In *Lang v. Murch*, 438 A.2d 914, 915 (Me.1981), we enunciated a two-part test for evaluating ineffective assistance of counsel claims. In a subsequent case we described the test as involving:

first, whether there has been serious incompetency, inefficiency, or inattention of counsel amounting to performance measurably below what "might be expected from an ordinary fallible attorney"; and second, whether any such ineffective representation "likely deprived the defendant of an otherwise available substantial ground of defense."

*Kimball v. State*, 490 A.2d 653, 656 (Me. 1985) (quoting *Lang*, 438 A.2d at 915). We later deleted the word "measurably" from the first prong of the *Lang* test, finding that the term "measurably" was without meaning in this context and served only to confuse courts applying the *Lang* standard. See *State v. Brewer*, 1997 ME 177, ¶¶ 6–7, 699 A.2d 1139, 1144. A few years after *Lang*, the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), articulated a similar two-part test that a petitioner must meet in order to obtain post-conviction relief. We noted that the *Strickland* and *Lang* tests are "virtually identical." *Kimball*, 490 A.2d at 656.

---

ering the entire record, there can be dispute as to what happened on July 3, 1998, but there is sufficient evidence for a fact finder to find that, superficial as they may have been, the petitioner did cause cuts on Mr. Aldus's body with a knife." Aldus has not cross-appealed from the Superior Court's finding that her plea was voluntary.

**5.** In addition to aggravated assault, Aldus pled guilty to (1) two counts of violation of a protection from abuse order (17–A M.R.S.A. § 506–B (Supp.1999)); (2) two counts of terrorizing (17–A M.R.S.A. § 210 (1983 & Supp. 1999)); (3) two counts of violation of bail conditions (15 M.R.S.A. § 1092 (Supp.1999)); and (4) refusing to submit to arrest (17–A M.R.S.A. § 751–A (Supp.1999)).

■ [¶ 13] In *Hill v. Lockhart*, 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985), the Supreme Court applied *Strickland* to convictions resulting from a guilty plea as opposed to a trial. *Hill* reformulated *Strickland's* second prong, the "prejudice" prong, to require a showing by the petitioner "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.* at 59, 106 S.Ct. 366. In *Laferriere v. State*, 697 A.2d 1301 (Me.1997), we said that in order to demonstrate prejudice, the petitioner had to show a reasonable probability he would have insisted on going to trial if he had not received ineffective assistance of counsel. We further said that "reasonable probability" means "a probability sufficient to undermine confidence in the outcome." *Id.* at 1305 (quoting *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052). These holdings mean that, before the Superior Court could vacate Aldus's conviction, it had to find that (1) the performance of Aldus's attorney fell below that of an ordinary fallible attorney; and (2) there is a reasonable probability that, but for her attorney's error, Aldus would not have entered a guilty plea and would have insisted on going to trial.

■ [¶ 14] We apply a deferential standard of review to the trial court's holding on both parts of the *Strickland/Hill* test. Whether the performance of an attorney falls below the standard is a question of fact. "We will not overturn a post-conviction court's determination as to the effectiveness of trial counsel unless it is clearly erroneous and there is no competent evidence in the record to support it." *Tribou v. State*, 552 A.2d 1262, 1265 (Me. 1989). *See also Brewer*, ¶ 19, 699 A.2d at 1144 (stating, "[w]e must uphold the court's findings regarding the quality of trial counsel's performance unless they are clearly erroneous and unsupported by any evidence in the record"); *True v. State*, 457 A.2d 793, 795 (Me.1983) (stating that the court's "findings, express and implied, are reviewed under the 'clearly erroneous

test' and will not be overturned on appeal unless there is no competent evidence to support them." (emphasis supplied)). *Lang*, 438 A.2d at 915 (vacating the denial of a writ of habeas corpus and remanding for consideration of the new standard enunciated in the decision "because it is a factual question"). Likewise, the finding of whether the petitioner was prejudiced by her attorney's error is a factual finding reviewed for clear error. *See Conner v. State*, 543 A.2d 819, 820–22 (Me.1988) (holding that the trial court's finding that petitioner was not prejudiced was not clearly erroneous). Our decisions have emphasized the fact-laden nature of post-conviction review when the issue is inadequacy of counsel. *See True*, 457 A.2d at 795. The two-prong inquiry set forth in *Strickland* and *Lang* "does not lend itself to categorical rules but rather is meant to be applied on a case-by-case basis." *Id.*

■ [¶ 15] We bear in mind that the purpose of the constitutional requirement of effective counsel is "to ensure a fair trial." *See Strickland*, 466 U.S. at 686, 104 S.Ct. 2052. That purpose, in the context of a conviction based upon a guilty plea, is to ensure that the advice of counsel is within the realm of an ordinary competent attorney because the voluntariness of the plea hinges upon whether the advice is that of an ordinary competent attorney. *See Hill*, 474 U.S. at 56–57, 106 S.Ct. 366. In *Laferriere* we noted that our inquiry is whether the plea proceeding produced a just result which is "the knowing and voluntary entry of a guilty plea by a guilty party." *Laferriere*, 697 A.2d at 1307. Thus, in making the determination of whether counsel was ineffective, we and the trial courts must be guided by the overall justness and fairness of the proceeding.

## III. WAS COUNSEL'S PERFORMANCE BELOW THAT OF AN ORDINARY FALLIBLE ATTORNEY?

[¶ 16] We examine first whether the performance of Aldus's attorney fell below

that of an ordinary fallible attorney. Aldus contends that her attorney's failure to request a halt in the proceedings, in order to investigate her question of why INS was looking for her, is performance below the standard.

[¶ 17] Preliminarily, the Superior Court found that Geller knew, before the date of the plea proceeding, that Aldus was not born in the United States. As the court acknowledged, this fact alone would not require any particular action or advice by counsel. But this fact, when combined with the statement from the prosecutor that INS was looking for Aldus, alerted, or should have alerted, Aldus's counsel to a potential problem with the immigration authorities. The Superior Court recognized that immigration law is a specialized area of the law with which ordinary criminal defense attorneys are not familiar. The court indicated that if the situation consisted solely of Geller's knowledge that Aldus was an alien and that INS was looking for her, it would not find that counsel was

inadequate. It was the fact that Aldus asked, "What does that mean?" when told that INS was looking for her and the fact that counsel did nothing to answer that question or advise Aldus that she could defer the proceeding to another day to get more information, that prompted the court to find that counsel had crossed the boundary between "ordinary fallible counsel" and "below ordinary fallible counsel."

■ [¶ 18] The State argues that, as a matter of law, an ordinary fallible attorney is not expected to advise criminal defendants of the potential for deportation because deportation is a collateral consequence of a plea.[6] We have not been called upon previously to determine if deportation comes within the collateral consequences doctrine or whether an alien defendant is deprived of adequate assistance of counsel when the attorney does not inform the defendant about deportation consequences.[7] We conclude that it is

---

**6.** We addressed the collateral consequences doctrine in at least two cases. In *Wellman v. State*, 588 A.2d 1178 (Me.1991), we held that a court was not required to inform a defendant of the collateral consequences of his plea and that a defendant's subjective misunderstanding of his entitlement to credit for time served in jail awaiting trial did not make his guilty plea involuntary. *Id.* at 1181. We pointed out, however, that the court fully complied with the requirements of M.R.Crim. P. 11 and informed Wellman of the direct consequences of his plea. *Id.* at 1180–81. In *Laferriere*, 697 A.2d at 1308, we held that *Laferriere's* expectation as to where he would serve his sentence was a collateral consequence of his conviction which did not render his plea involuntary. Several times in that opinion we noted that the Rule 11 judge was meticulous in questioning Laferriere to make certain that he understood the consequences of his plea. *Id.* at 1305, 1307–08.

There is a sound basis for the collateral consequences doctrine. Neither courts nor defense counsel can be expected to be aware of the multitude of potential consequences that may flow from a conviction. Courts do not always agree upon whether a particular consequence is collateral or direct, but generally speaking, those consequences that do not flow directly from the sentence are considered collateral. Several opinions and com-

mentators have catalogued examples of collateral and direct consequences. *See, e.g., Fruchtman v. Kenton*, 531 F.2d 946, 948–49 (9th Cir.1976); Priscilla Budeiri, *Collateral Consequences of Guilty Pleas in the Federal Criminal Justice System*, 16 Harv. C.R.-C.L. L.Rev. 157, 170–87 (1981). The term "collateral consequences" involves both consequences that can be foreseen because of the automatic operation of statutes, such as the loss of a license, or that are possibilities that depend upon the defendant's own future conduct, such as the enhancement of a sentence in the future if the defendant is again convicted of a crime.

**7.** The majority of courts that have decided the issue in the post-conviction context have concluded that counsel is not ineffective for having failed to advise the defendant about deportation. Most courts do so on the basis that deportation is a collateral consequence. *See United States v. Del Rosario*, 902 F.2d 55, 59 (D.C.Cir.1990); *United States v. George*, 869 F.2d 333, 337 (7th Cir.1989); *United States v. Yearwood*, 863 F.2d 6, 7–8 (4th Cir. 1988); *United States v. Campbell*, 778 F.2d 764, 768–69 (11th Cir.1985); *Tafoya v. State*, 500 P.2d 247, 252 (Alaska 1972); *People v. Huante*, 143 Ill.2d 61, 156 Ill.Dec. 756, 571 N.E.2d 736, 741 (1991); *Mott v. State*, 407 N.W.2d 581, 582 (Iowa 1987); *Alanis v. State*,

not necessary for us to address the collateral consequence doctrine in order to decide Aldus's case. Instead, we conclude that the ordinary fallible attorney is expected to advise a defendant, when that client has a question about a serious conse-quence of a plea agreement,[8] that the plea need not be entered that day. The attorney should advise the defendant about the ramifications of delay[9] and the possibility of obtaining a continuance of any matters scheduled that day so that the defendant

583 N.W.2d 573, 579 (Minn.1998); *State v. Dalman*, 520 N.W.2d 860, 863 (N.D.1994); *Commonwealth v. Frometa*, 520 Pa. 552, 555 A.2d 92, 93–94 (1989). Some courts, while holding that an attorney's failure to advise a defendant about potential deportation is not ineffective assistance of counsel, pronounce that it is preferable that defense counsel give advice about potential deportation. *See United States v. Banda*, 1 F.3d 354, 356 (5th Cir.1993); *Durant v. Coughlin*, 1999 WL 528832, *3 (Conn.Super.Ct.1999).

Although the majority of courts do not find ineffective assistance of counsel for failure to advise a defendant about deportation, there are a number of courts that do. Some take the position that an affirmative misrepresentation by counsel on the deportation consequences of a conviction is ineffective assistance of counsel. *See Williams v. State*, 641 N.E.2d 44, 49 (Ind.Ct.App.1994). *Cf. United States v. Russell*, 686 F.2d 35, 41–42 (D.C.Cir. 1982) (allowing defendant to withdraw guilty plea pursuant to former F.R.Crim. P. 32(d) because government incorrectly informed defendant that conviction would not subject him to deportation). Other courts conclude that failure to advise an alien defendant on possible deportation consequences can be ineffective assistance of counsel. In *People v. Pozo*, 746 P.2d 523, 529 (Colo.1987), the Colorado Supreme Court concluded that the failure of an attorney to learn the basics of immigration law when the defendant is an alien, is similar to the failure of an attorney to research the law of the crime with which the defendant is charged. The court held that potential deportation consequences are material and the failure to investigate those consequences, when the attorney knows that the defendant is an alien, constitutes ineffective assistance of counsel. In *People v. Soriano*, 194 Cal.App.3d 1470, 240 Cal.Rptr. 328 (1987) there was conflicting evidence at the post-conviction hearing regarding the advice given by the attorney to the defendant. "What is uncontested is that counsel, knowing defendant was an alien, ... did not make it her business to discover what impact his negotiated sentence would have on his deportability." *Id.* at 335. The court concluded that the defendant was deprived of adequate assistance of counsel because he was not adequately advised of the immigration consequences. *Id.* at 336.

8. The fact that deportation is an extremely serious matter cannot be questioned, and there can be little doubt that practicing attorneys should understand the importance and severity of deportation. In his treatise-like opinion in *Mojica v. Reno*, 970 F.Supp. 130 (E.D.N.Y.1997), Judge Weinstein wrote:

The importance of immigration consequences of pleas in criminal cases cannot be underestimated. Deportation to a country where a legal permanent resident of the United States has not lived since childhood; or where the immigrant has no family or means of support; or where he or she would be permanently separated from a spouse, children and other loved ones, is surely a consequence of serious proportions that any immigrant would want to consider in entering a plea. As Justice Black wrote: "To banish [an immigrant] from home, family and adopted country is punishment of the most drastic kind." *Lehmann v. United States*, 353 U.S. 685, 691, 77 S.Ct. 1022, 1025, 1 L.Ed.2d 1122 (1957) (Black, J., concurring); *see also Lok v. INS*, 548 F.2d 37, 39 (2d Cir.1977) ("[d]eportation is a sanction which in severity surpasses all but the most Draconian criminal penalties"). An immigrant can be expected to weigh the likelihood of this drastic punishment just as he or she would weigh other matters in a plea-such as the likely sentence, the availability of parole, and the overall disruption the plea will cause to his life.

*Mojica*, 970 F.Supp. at 176–77.

The significance of deportation is likely the reason that a number of states, legislatively or by rule, have mandated that courts, before accepting guilty pleas, notify defendants that if they are not United States citizens deportation is a possible consequence of a conviction. *See, e.g.*, CONN. GEN.STAT. § 54–1j (1994); MASS. GEN. LAWS ch. 278, § 29D (1998). *See also*, Susan Pilcher, *Justice without a Blindfold: Criminal Proceedings and the Alien*, 50 ARK. L.REV. 269, 319 n. 217 (1997) (listing fourteen state statutes or rules requiring courts to advise aliens on deportation consequences).

9. If there was a possibility that the State would withdraw its plea offer if pleas were not entered that day, Aldus should have been advised about that possibility.

can obtain information concerning the consequences of the plea and better evaluate her position. The choice to accept the plea agreement is left to the defendant but after advice that deferring the plea is an option. Given the fact that Aldus said she wanted the matter concluded, it is possible that she would have decided to proceed with the plea even after being advised that it could be rescheduled, but she should have been advised of her options. Geller should have made certain that Aldus wanted to proceed with the plea agreement in the face of uncertainty about why INS was looking for her, and he should have made certain that she understood that it was her choice to proceed that day or return to court on another day as the judge had previously suggested.

[¶ 19] Whether there has been ineffective assistance of counsel is a factual determination dependant upon the particular facts of the case before the court. The sole issue in this case is whether the Superior Court's factual determination that Aldus was deprived of effective assistance of counsel should stand or whether the evidence compelled a contrary finding. Following the standard of review that we have utilized consistently in postconviction matters, we view the facts of the case before us, and we do not overturn the trial court unless it is clearly erroneous. *See Kimball*, 490 A.2d at 657. The post-conviction court had before it all of the facts surrounding Aldus's guilty plea and was well aware of the context in which the plea was taken. It considered the fact that Geller knew that Aldus was not a citizen; that the prosecutor told Geller that INS was inquiring about Aldus; and that Aldus herself asked Geller what it meant that INS was looking for her. That factual context included a Rule 11 proceeding in which the District Court did not personally address Aldus regarding her rights, the elements of the offense, and the maximum sentence as required by Rule 11(c). The Superior Court viewed the totality of the factual scenario in light of the purpose of the

constitutional requirement of effective counsel. It considered the overall justness and fairness of the plea proceeding. The court determined as a matter of fact, looking at these particular circumstances, that counsel was ineffective, and on the facts of this case we cannot say that the court was clearly erroneous.

## IV. WAS ALDUS PREJUDICED BY HER COUNSEL'S ERROR?

[¶ 20] The "prejudice" prong of *Strickland*, as reformulated by *Hill* and applied in *Laferriere*, required Aldus to show a reasonable probability, meaning "a probability sufficient to undermine confidence in the outcome," that she would have insisted on going to trial if she had not received ineffective assistance of counsel. *Laferriere*, 697 A.2d at 1305 (quoting *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052). The State argues that the Superior Court erred in its explicit finding that Aldus met her burden of showing prejudice and its implicit finding that she would not have pled guilty but for her attorney's error.

[¶ 21] The court identified the attorney's error as the failure to request a halt in the proceedings in order to answer Aldus's question about why INS was looking for her. Aldus testified at the post-conviction hearing that Geller did not tell her that a continuance could be requested and if she had known that a continuance was possible, "I would have taken a continuance." She further testified that she did not think she would be found guilty at a trial, because she was innocent. This testimony raises a fair inference that if Geller had told Aldus that they could defer entering a plea on the aggravated assault charge to find out why INS was looking for her, Aldus would not have entered a plea of guilty. The court was justified in determining there is a reasonable probability that, but for her attorney's error, Aldus would not have entered a guilty plea and would have insisted on going to trial. The evidence does not compel a finding that

Aldus suffered no prejudice from her attorney's error.

The entry is:

Judgment affirmed.