005578

STATE OF MAINE      STATE OF MAINE SUPERIOR COURT
CUMBERLAND, ss.      CUMBERLAND, SS DOCKET NO. CR-11-8 4 7 2
                     CLERK'S OFFICE  JAN - CUM - 9/30/2013

CHRISTOPHER R. MARTIN
                2013 SEP 30 AM 9 55

v.                          ORDER ON POST-CONVICTION REVIEW


STATE OF MAINE


## PROCEDURAL BACKGROUND

Christopher R. Martin filed a petition for post-conviction review of a judgment of

conviction for burglary (Class B).[1] He pled guilty on April 29, 2011. On June 24, 2011

the court sentenced him to a five-year period of incarceration with the Department of

Corrections on three burglary counts, concurrent with each other and concurrent with

sentences on lesser charges. This sentence was consecutive to sentences received in 2006

in the Androscoggin County Court. His probation was revoked in the Androscoggin cases

at the time of his plea in the Cumberland County cases. He appealed his sentence to the

Law Court, which appeal was denied on October 3, 2011.

## GROUNDS ALLEGED

The petitioner filed the motion now before the court alleging ineffective

assistance of counsel during his plea, imposition of an excessive sentence, and undue

pressure to enter a guilty plea. He argued that he was told by his plea counsel that he

would receive a lesser sentence than that which the court actually imposed, and he

---

[1] Christopher R. Martin was indicted for three counts of burglary (Class B), three counts of theft
by unauthorized taking (Class C), one count of reckless conduct with a dangerous weapon (Class
C), two counts of attempted burglary (Class C), as well as four counts of misdemeanors (Class E).
He pled guilty to all counts in the indictment, with the exception to the reckless conduct with a
dangerous weapon, which the prosecutor dismissed. See CUMCD-CR-2010-8565. On the same
day, he admitted to a probation revocation arising out of Androscoggin County.

asserted in his petition that "I did not understand anything about what was going on." Subsequent to receiving a court-appointed attorney in the post-conviction matter, Martin amended his petition to allege his plea counsel was further ineffective in failing to review discovery and determine whether there was a factual basis for the plea entered. He asserts in his amendment that counsel did not in fact review discovery with defendant; therefore, the plea was not knowing and voluntary. By the time of the PCR hearing, Martin asserted that counsel did not provide him with copies of discovery. At Martin's PCR hearing, his attorney articulated Martin's arguments to be two fold, first was ineffective assistance of counsel, as a result of counsel's failures around discovery, and second, the involuntariness of his plea.

At the hearing on his petition, Petitioner presented the transcript of the plea and sentencing proceedings, his own testimony, the testimony of Henry Griffin, his appointed-counsel at the trial level, and the testimony of Stephen Brochu, the attorney who filled in for Griffin during the plea.

## DISCUSSION

1. Ineffective Assistance of Counsel Standard

To determine whether Martin received constitutionally ineffective assistance of counsel, this court must examine:

> [F]irst, whether there has been serious incompetency, inefficiency, or inattention of counsel amounting to performance . . . below what might be expected from an ordinary fallible attorney; and second, whether any such ineffective representation likely deprived the defendant of an otherwise available substantial ground of defense.

*Alexandre v. State*, 2007 ME 106, ¶ 43, quoting *Aldus v. State*, 2000 ME 47, ¶ 12, 748 A.2d 463, 467. "[T]he federal and state guarantees are virtually identical." *McGowan v.*

2

*State*, 2006 ME 16, ¶ 12, 894 A.2d 493, 497.[2] "The burden is on the defendant to prove both prongs." *Id.* However, the court "begin[s] with the second prong regarding prejudice because if it is determined that there was no prejudice, there is no need to address the first prong regarding whether counsel's performance was deficient." *Francis v. Maine*, 2007 ME 148, ¶ 4.

To demonstrate prejudice at a plea proceeding, a petitioner has to show that there was a reasonable possibility that he would have insisted on going to trial but for his attorney's performance. *Laferriere v. State*, 1997 ME 169, ¶ 8, 697 A. 2d 1301, 1305. "A reasonable probability means a probability sufficient to undermine confidence in the outcome." *Aldus v. State*, 2000 ME 47, ¶ 13 (citation and quotation marks omitted). Thus, Martin has to demonstrate that (1) the performance of his plea counsel fell below that of an ordinary fallible attorney; and (2) there is a reasonable probability that, but for his attorney's error, he would not have entered a guilty plea and would have insisted on going to trial. *Id.*

2.      The Court's Factual Findings Following the PCR Hearing

At the PCR hearing, Martin testified that there were two Christopher Martins in the criminal justice system at the same time and Henry Griffin represented both of them. Christopher R. Martin, the petitioner in the pending matter, was charged with a number of crimes, including burglary, attempted burglary, theft, reckless conduct with a

---

[2] The test, as articulated by the United States Supreme Court is:
> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984).

3

dangerous weapon and driving to endanger. Christopher N. Martin, the other Christopher Martin, was charged with domestic violence and was involved in a child protection matter. Martin argues that his attorney confused him with the other Christopher Martin, resulting in Griffin not sending to him and his not receiving or reviewing the discovery in his case. Rather, Griffin sent him the discovery related to a Christopher N. Martin, who was held in Androscoggin County Jail. With respect to the Christopher Martin mix up, Griffin had the right street name but the wrong street number. Griffin mailed discovery to 35 Allen Avenue, when the actual address was care of his father's home at 55 Allen Road, Pownal. Mr. Martin was incarcerated in the Cumberland County Jail during the entirety of this case; therefore, the proper place to send him his correspondence and discovery was the Cumberland County Jail.

Martin argues that Griffin's errors were complicated by Stephen Brochu, an attorney who stood in for Griffin at the plea proceeding, because Brochu said at the plea that he had not reviewed the discovery but believed that Griffin reviewed the discovery with Martin. (Tr. 18.) And, the plea proceeding was further complicated by more confusion when the plea judge asked a question, according to Martin's PCR counsel, using a "double negative." (Tr. 12.)

According to Griffin, he was aware that there were two Christopher Martins, they were both his clients, but he had not thought about the other Christopher Martin and the consequences of confusing them. The other Christopher Martin is Christopher N. Martin, an African-American man charged with crimes in Androscoggin County. Griffin testified that his staff mistakenly sent the wrong files to Christopher R. Martin: his staff sent the domestic violence and child protection files of the other Christopher Martin to

4

Christopher Martin. In the actual office files, plea counsel' staff had mixed records of the two Christopher Martins. For example, Griffin's staff sent to Christopher R. Martin the order of child protection from the Lewiston District Court and filed this order in the file of Christopher R. Martin. Griffin's office sent correspondence to 35 Allen Avenue when Christopher R. Martin was in the Cumberland County Jail. Griffin's office also sent correspondence for Christopher R. Martin to the wrong jail. The address errors occurred right from the beginning at the intake of Christopher R. Martin as a client. The intake sheet discloses that the street address was mistakenly recorded as 35 Allen Road, Pownal. Griffin accompanied Martin to his initial appearance on December 15, 2010 and, as a result, he knew that Christopher R. Martin did not make bail and was housed at the Cumberland County Jail. Therefore, plea counsel should have known that the proper mailing address was the Cumberland County Jail, and not Martin's father's address at 55 Allen Road or the Androscoggin County Jail.

In terms of communication of proposed sentences, the State sent to Griffin the State's sentencing memorandum. The State asked for consecutive sentences between the probation violation and the new charges. Griffin didn't know whether his office forwarded the State's sentencing memorandum to Martin. Martin, however, testified that he did not receive the State's sentencing memorandum.

Griffin's time records show that he met with his client on March 7, 2011, he reviewed discovery on March 14, 2011 and according to his regular practice he tried to send discovery the same day. On March 15, 2011, Griffin reviewed discovery again. On April 25, 2011, Griffin met with his client before the Rule 11 plea scheduled for April 29, 2011. The billing records do not show that he reviewed discovery with his client. The

5

billing records disclose that he met with his client two times before the plea and the first date was before he had received the discovery and the second date was just a few days before the plea. Griffin responds that although the bill does not say he discussed discovery with client, he knows that he would have done this because it is his practice to review discovery with his clients and he doesn't write those things down.

In terms of asking Brochu to fill in for him, Griffin spoke only by telephone with Brochu and Brochu never met Christopher R. Martin before the Rule 11 plea. Brochu did not obtain the file before the plea. He had only a copy of the operative pleadings, including the motion to revoke probation and the indictment. On the morning of the plea, Brochu spoke with Martin and asked him all the questions Brochu expected the judge would ask Martin, including whether he had enough time to review discovery. Martin said he did and he was ready to go forward. When the plea judge asked Brochu whether he or Martin had reviewed the discovery, Brochu responded, "I have not specifically reviewed it, but based upon my discussions with Attorney Griffin and my discussions here with defendant, I'm confident that there was a good analysis, he understands what is contained - -." (Tr. 18.) Brochu testified that if there had been any questions about discovery, he would have recommended that the plea not go forward. Brochu further testified that he did not know what Martin received but if he had learned that Martin had not received a lion share of the discovery, he would not have gone through with the plea. Griffin, however, had told him, "He had gone over everything with Mr. Martin."

Martin wanted to be sentenced the day of the plea. He asked Brochu why he could not be sentenced that day. Martin also asked Brochu if he had an opinion and Martin asked Brochu to contact Griffin as soon as possible. Brochu testified that the plea judge

6

asked Martin if he had gone over the case with Attorney Griffin, and did he have enough time to talk with his attorneys? When the plea judge asked him if he still wanted to go forward with his guilty plea, Martin said, "Yes, I do." (Tr. 14.) When the plea judge asked Martin if he disagreed with the factual basis set forth by the prosecutor, Martin responded, "Not that I can think of, no." (Tr. 17.) That recitation of the State's case, informed the parties in the courtroom that one of the alleged victims was in her home when Martin broke into her house and she recognized him from prior work Martin had done at her home. (Tr. 16.) She called the police while Martin was still in her home. (Tr. 16.) The only issue that arose during the plea was with respect to the charge of reckless conduct with a dangerous weapon. Martin objected to this charge and he showed no confusion about not pleading to that charge. The State dismissed that charge.

Griffin, who has been a defense attorney for twenty-one years, did not have a good recollection of this case. He was present at Martin's initial appearance. His practice regarding discovery is to mail it to the defendant. Some times he drops the discovery off at the jail because he lives in Portland. Griffin testified that it is *always* his practice to provide discovery. After mailing the discovery, he would go to the jail and discuss the discovery with the client. He recalled that in this case there was a probation violation alleged out of Androscoggin for which there was a no bail hold. The court set a high bail on the new charges. Griffin recollects that the discussion about discovery was much sooner than the billing record reflects. Griffin recalls discussing bail, discussing discovery, discussing the motion to suppress and how they were going to handle the case. Indeed, Griffin's file contained an undated note in his handwriting and the note stated, among other things, meeting with Chris and "argue for concurrent and check out damage

7

to BMW." (Pet. Ex. 20.) But it was not his practice to reflect all this on the billing record. One can infer from this note that "concurrent" refers to concurrent sentences and it is likely that Martin was aware that there was an issue between consecutive and concurrent sentences and that he discussed this with Griffin.

With regard to supporting the concurrent sentence argument, Griffin's notes reflect that Chris gave him the names of people to contact. There were additional notes about the video and the people to interview. From the State's perspective, the alleged facts were that the defendant was running away from the police in a white vehicle. The police caught him in a white BMW. In the vehicle were stolen items from various places, all in plain view.

Martin filed a motion to suppress but ultimately decided that the best thing would be to take responsibility and plead. Griffin states they did go over the discovery, they discussed the elements of the crime in sequence, and Griffin told him what the police report said. Griffin knew the prosecutor wanted consecutive sentences from the beginning. Griffin argued for fully suspended consecutive sentence that he was trying to get for Martin. He was trying to get the lowest sentence possible given Martin's lengthy criminal history. On the probation violation, Martin had five years "hanging over him". It was a very difficult case to defend because the discovery showed that there was a woman on the phone with the police, describing the car and driver as he was driving away from her house with the car full of stolen goods. She could identify Martin because he had done work for her at an earlier time. Griffin knew that he would either defend the case with a motion to suppress or a plea. And, he always tells clients, "It is their choice." Griffin understood from the beginning that the State was looking for consecutive

8

sentences. He doesn't recall what he told Martin, but he is pretty sure he told him what the State's offer was because it is always his practice to convey the State's offer. Griffin thought it would be best to try to get three years on the probation violation and a consecutive sentence, fully suspended, on the new charges. His sentencing memorandum made this request. His notes confirm that Martin wanted concurrent sentences, but the amount of evidence against Martin and his criminal history increased the risk of consecutive sentences.

Griffin testified about his practice and routine in communicating and working with criminal defendants. He is absolutely certain he discussed discovery, plea offers and strategy with Martin before the sentencing. In sentencing, Griffin knew he would have to convince the court that Martin deserved another chance. Griffin testified that he prepared Martin the same he prepares other clients. Griffin does not recall if he discussed his sentencing memorandum with Martin but he did discuss defense strategy with Martin. Griffin testified, "I got his consent to the defense strategy." If Martin wanted to pursue the motion to suppress, I would have argued that motion." "I would have gone to trial if he wanted to." Griffin discussed the motion to suppress with Martin and what to do with it. Ultimately, Martin instructed Griffin to withdraw it.

Martin recalled that the discovery included mention of another man and another white BMW involved and a description of the alleged perpetrator's height and weight that varied from Martin's. Griffin did not recall much of this information. As to the discovery package, Griffin testified he either mailed it in a large envelope or hand delivered the package or, he conceded, maybe he didn't get the package to Martin. Griffin remembers talking to Martin about the discovery and that the different physical

9

descriptions were not going to be part of the case. But frankly, Griffin did not have a lot of recollection of this case. Much of his testimony relied on his practice and routine.

Martin testified, that by the day of the plea he had not received the large file of discovery; he received just ten pages of discovery. He also received discovery about the insurance claims and estimate of damages. He received the discovery that belonged to the other Christopher Martin about his child protection and assault case in the Lewiston District Court. Martin never received a copy of the State's sentencing memorandum. Martin maintained he first saw all the discovery when he met with his new PCR attorney, Scott Lynch, in December of 2012. If he had received the discovery before he had pled, Martin claims he would not have taken the plea. When the PCR judge asked him why, Martin responded, "because there was evidence of two men in a four-door car and there were different height and descriptions for them and the police were under the impression that there were two white vehicles." He claimed that he would have put the State through its proof if he had received this discovery. This is in direct conflict with his plea counsel's testimony that they discussed defense strategy and that Martin wanted to withdraw his motion to suppress and accept responsibility for his conduct.

Martin also testified that he had no memory of the day of the crime. He had seen a doctor and was on a new medication, clonidine, and he has "not even blips of that day." He also never received copies of communications or emails between the prosecutor and Griffin discussing whether the sentences would be consecutive or concurrent. However, he admits that he did know that the longer the criminal history, the longer the new sentence would be. His serious criminal history went back to 2000 with a number of thefts and burglaries and drug convictions as well as probation violations and bail

violations. Martin was unable to explain why he did not tell the plea judge, after the prosecutor had provided a factual basis for the plea, that he did not agree or understand. All that Martin could say was that the plea was very stressful and everything was going very quickly. At the time of the plea, Martin had been held since December 15, 2010. He was arrested in a white vehicle and he awoke in the Cumberland County Jail. He does not remember a police chase. When asked why he would not plea to reckless conduct, Martin said, his "father got the vehicle out of impound and the vehicle was very clean, I didn't actually hit the vehicle. I talked this over with Henry [Griffin] – reason didn't want to plead to reckless [charge]." That charge was dismissed. The relevant point is that he had discussed at least the reckless case with Henry Griffin and he was able to ensure that he did not plead to that charge.

Martin claims that when he was advised during the plea what the maximum penalty was for a Class C and Class B crime, "I was not aware that meant there was going to be consecutive sentences." He asserts that he never knew that the State was seeking consecutive sentences.

His PCR attorney argues that it is understandable that Martin did not understand that he could receive consecutive sentences given the plea judge's question using a double negative.

After taking Martin's admission to his probation violations and Martin's statement that he understood that as a result of his admission to the probation violation he could receive up to four years and three hundred and forty-six days in prison, the court explained the elements of the new charges. The following colloquy occurred among the plea judge, the prosecutor and Mr. Martin:

11

*Court*: I take it the State is not going to be asking for consecutive sentences here?

*Ms. Sheridan*: Well between the revocation and the new conduct, - -

*Court*: All right.

*Ms. Sheridan*: - - we are, Your Honor.[3]

*Court*: All right. Between – but as between each of the -- each of the offenses in CR-10-8568, you are not going to be asking for consecutive sentences with respect to those?"

*Ms. Sheridan*: No, we are not.

*Court*: All right. So, just so that you, my understanding is we have an open plea here today, so the maximum penalty for a Class B offense is ten years in jail, a twenty-thousand dollar fine and three years of probation, a Class C offense, the maximum penalty is five years, a five-thousand dollar fine and two years' worth of probation. You understand that if at the end of this I accept your open plea, the risk is that on the B's you can do a maximum and on the C's you can do the maximum. You understand that? You have to say yes if you –

*Mr. Martin*: (Inaudible response)

*Court*: That's all right. It's a lot of yeses today. All right. And with respect to what the State's telling me is that they're going to make an argument at sentencing that in addition to the – potentially the maximum of a Class B and a Class C they're also going to try to add on top of that the three – the maximum sentence with probation revocation that we discussed earlier. Do you understand this?

*Mr. Martin*: Yes.

(Tr. 11-12.) So, the plea judge understood that the State was asking for consecutive sentences as between the probation revocation and the new charges and explained this to Martin, who reflected back that the understood.

Martin's PCR attorney argues that this colloquy did not clarify that the State was seeking consecutive sentences. The State counters that the Plea Judge was very clear in setting forth that there could be consecutive sentences. The State also argues that Martin heard so much in the Sate's recitation of the facts, yet he said nothing. Mismailing information only shows where the contents went, according to the State, and it does not inform us whether Griffin discussed with Martin the discovery and plea negotiations. Griffin's billing record shows that he reviewed discovery multiple days before the plea.

---

[3] The original plea transcript discloses that Ms. Sheridan responded, "-- we are not, Your Honor." The court granted the State's request to correct the transcript, and it was corrected to state, "-- we are, Your Honor." The petitioner objected to the court's order correcting the transcript.

Finally, Griffin's strategy which Martin approved paid off, that is consecutive sentences were fully suspended.

3. Providing Discovery

Martin argues that a defense attorney has an affirmative duty to physically produce a copy of the discovery to a criminal defendant as well as review that discovery with defendant. Martin cites to a number of standards and rules applicable to criminal defense attorneys. The Maine Commission on Indigent Legal Services provides in the rules applicable to assigned counsel that defense counsel "should . . . provide sufficient information to permit intelligent participation in decision-making by the client." 94-649, CMR Ch. 102, § 5(7)(B). Rule 1.4 of the Maine Rules of Professional Conduct requires lawyers to "keep the client reasonably informed about the status of the matter" and "promptly comply with reasonable requests for information." The Comment to Rule 1.4 states that "reasonable communicating between the lawyer and the client is necessary for the client to effectively participate in the representation." Comment 2008, Section 6, M.R.Prof.Conduct 1.4. None of these rules establish an affirmative duty to physically produce a copy of the discovery to a criminal defendant. The requirement is to provide sufficient information and to keep the client reasonably informed so the client may participate in his defense.

Arguably, the preferred practice is to provide copies of all discovery to the defendant but the rules do not require this. Rather, the rules require that sufficient information be provided so that the defendant can participate in decision-making. Griffin provided sufficient information for Martin to assess whether he wanted to proceed with his motion to suppress. Moreover, Martin was found in a white vehicle with the stolen

13

goods, and Griffin shared with Martin discovery that showed there was a woman on the phone with the police describing the car and driver as he was driving away from her house with the car full of stolen goods and that the woman could identify Martin because he had done work for her at an earlier time. This was a strong cases for the State.

The "burden is on the defendant to show not only that trial counsel's performance was deficient but also that the deficiency likely affected the outcome of the trial." *State v. Jurek*, 594 A. 2d 553, 555 (Me. 1991) (citing *Lang v. Murck*, 438 A. 2d 914, 915 (Me. 1981)). "Failure to prove resultant prejudice precludes relief regardless of the quality of counsel's performance." *Id.* (citing *State v. Dafoe*, 463 A. 2d 770, 775 (Me. 1983)). Here, there was no evidence that Griffin's performance likely deprived Martin of an otherwise available substantial ground of defense. Griffin provided sufficient information and kept Martin reasonably informed so that Martin could effectively participate in his representation and decide to enter pleas of guilty. Martin has failed to demonstrate that Griffin's performance was deficient and Martin would not have entered a guilty plea and would have insisted going to trial. With such strong evidence and a lengthy criminal history, the risk was to great to go to trial.

3.    Voluntary Plea

Finally, there is the issue whether Martin made a voluntary and knowing plea. He argues that Griffin failed to provide him with the entire packet of discovery and that if he had he would have put the State through its proof. Martin argues that he would not have pled guilty and would have gone to trial if he had known that there were alternate suspects driving a similar white vehicle. This argument does not pass the straight face test in light of the strength of the evidence against Martin

14

For Martin to prevail he must show that "(1) the performance of [his] attorney fell below that of an ordinary fallible attorney; and (2) there is a reasonable probability that, but for [his] attorney's error, [he] would not have entered a guilty plea and would have insisted on going to trial." *Aldus v. State,* 2000 ME 47, ¶13, 748 A.2d 463. "[T]he test is applied on a case-by-case basis, and evaluations of ineffective assistance of counsel claims are 'guided by the overall justness and fairness of the proceeding.'" *McGowan v. State,* 2006 ME 16, ¶12, 894 A.2d 493 (quoting *Aldus,* 2000 ME 47, ¶¶ 14-15, 748 A.2d 463). "'[R]easonable probability' is 'a probability sufficient to undermine confidence in the outcome.'" *Laferriere v. State,* 1997 ME 169, ¶ 8, 697 A.2d 1301 (quoting *Strickland v. Washington,* 466 U.S. 668, 694 (1984)).

"A plea is valid if it is made voluntarily with knowledge of the elements of the crime, the penalty that might be imposed and the constitutional rights relinquished by foregoing trial." *Laferriere,* 1997 ME 169, ¶ 9, 697 A.2d 1301 (quoting *State v. Comer,* 584 A.2d 638, 640 (Me. 1990).

In the case at bar, there is no credible evidence that plea counsel withheld any information. According to Griffin he discussed the discovery with Martin on multiple occasions. Although the billing records do not directly support Griffin's testimony, his personal notes and the testimony of Attorney Brochu, who filled in for Griffin at the Rule 11 plea, do provide the support necessary for the court to believe that Martin did in fact have knowledge of the discovery and the facts of the case. In fact, Attorney Brochu testified that when he asked Martin if he had enough time to review the discovery he answered in the affirmative. Additionally, when Martin was asked by the plea judge if he

15

disagreed with the factual basis set forth by the prosecutor during the Rule 11, Martin answered "Not that I can think of, no." (Tr. 17.)

As far as Martin's knowledge of the elements of the crimes for which he was charged, a review of the Rule 11 plea transcript clearly shows that the plea judge methodically outlined what the State would be required to prove for each count. *See* Tr. 7-11. After reviewing the elements of each count, the plea judge went over the fact that this was an open plea and what the worse case scenario was, and then, asked whether he still wanted to go through with the plea. (*See Tr.* 11-14). Greater care could not have been taken during the entry of Martin's plea. When viewing the totality of the circumstances and the overall justness and fairness of the plea proceeding, this court concludes that Martin's plea was made with knowledge and was voluntary.

Martin has failed to show that there was a reasonable possibility that he would have insisted on going to trial but for his attorney's performance. The overall fairness and justice of this representation in the case at bar equals or exceeds that contemplated by the Maine Bar Rules or M.R.Crim.P. 11.


The entry is:

Petition DENIED.


Date:    September 27, 2013    _____
                                Joyce A. Wheeler, Justice
                                Maine Superior Court

16