STATE OF MAINE          SUPERIOR COURT
CUMBERLAND, ss.          DOCKET NO. CR-09-7022

RODNEY TUCKER

v.                ORDER ON POST-CONVICTION REVIEW

STATE OF MAINE

## PROCEDURAL BACKGROUND

Rodney Tucker filed a petition for post-conviction review of a judgment of conviction of one count of gross sexual assault by compulsion (Class A), 17-A M.R.S. § 253(1)(A) (2008), entered in the Superior Court (Cumberland County, *Cole, J.*) following a jury trial. On May 16, 2008, the trial court (Cole, J.) sentenced him to a fifteen-year period of incarceration with the Department of Corrections with all but seven years and six months suspended and a four-year probationary term. The Law Court denied his appeal on May 20, 2009.

## GROUNDS ALLEGED

The petitioner filed the petition now before the court alleging ineffective assistance of counsel based on:

1. Failure to secure Dustin Howard as a witness and prepare Jennifer Ramsdell regarding victim's reputation for untruthfulness in the community;

2. Failure to interview, secure and prepare witnesses regarding victim's admission to making up charges against petitioner;

3. Failure to secure witness who would contradict prosecution's theory that petitioner hit the victim;

4. Failure to impeach the State's witnesses regarding whether petitioner hit or kicked an officer and was arrested earlier in the day of the incident, letting the jury retain the incorrect image of petitioner being arrested for violent behavior;

5. Failure to locate and interview potential corroborating witnesses;

6. Failure to submit physical evidence (a photograph of petitioner taken the day of the incident) that would corroborate petitioner's theory of the case; and

7. Failure to prepare defendant for direct and cross examination and failure to present defendant's testimony consistent with the defense's theory of the case, that there was an interaction between the victim and petitioner, but that it was consensual and did not amount to a sexual encounter.

Tucker presented at the PCR hearing an experienced defense attorney who discussed the importance of a consistent defense theory with a plan for getting the story before the jury. Petitioner's expert explained the importance of reviewing discovery with a defendant so that at critical stages of the proceedings, i.e. whether to testify, defendant can make informed decisions. Here, defense counsel presented a defense theory in his opening statement that the jury would hear Rodney's story, but that story was never presented during the trial. According to Petitioner's expert, the defense counsel had exculpatory statements, which may have provided a way to get Tucker's story before the jury. In the absence of achieving that, trial counsel should have put Tucker on the stand so that his story would be presented. Defense counsel attempted neither.

At the hearing on his petition, Tucker presented the transcript of the trial, his own testimony, the testimony of Robert Menzies, a private investigator, and Thomas

2

Connolly, Esquire, as an expert defense attorney. Sadly, the trial counsel passed before the hearing on the petition and the court is left with only the trial transcript, Tucker's representation of what occurred between him and defense counsel and defense counsel's bill for his services. The court lack's defense counsel's testimony about his trial strategy; therefore, the court can only infer from the evidence what the trial strategy was based on the evidence known to him.

## DISCUSSION

A.    Standard for Ineffective assistance of counsel

To determine whether Tucker received constitutionally ineffective assistance of counsel, this court must examine:

> [F]irst, whether there has been serious incompetency, inefficiency, or inattention of counsel amounting to performance . . . below what might be expected from an ordinary fallible attorney; and second, whether any such ineffective representation likely deprived the defendant of an otherwise available substantial ground of defense.

*Alexandre v. State*, 2007 ME 106, ¶ 43, quoting *Aldus v. State*, 2000 ME 47, ¶ 12, 748 A.2d 463, 467. "The burden is on the defendant to prove both prongs." *McGowan v. State*, 2006 ME 16, ¶ 12, 894 A. 2d 493, 497. However, the court "begin[s] with the second prong regarding prejudice because if it is determined that there was no prejudice, there is no need to address the first prong regarding whether counsel's performance was deficient." *Francis v. Maine*, 2007 ME 148, ¶ 4. Defendant must show that his "attorney's performance deprived him of a substantial ground of defense, or that counsel's performance likely affected the outcome of the trial." *McGowan*, 2006 ME ¶ 13 (citations and quotation marks omitted).

3

In evaluating ineffective assistance of counsel claims, the court is to employ a "reasonably competent assistance" standard. *Pineo v. State*, 2006 ME 119, ¶ 10, 908 A. 2d 632, 638. "[D]efense counsel's performance is judged from a highly deferential standard, i.e., an objective standard of reasonableness, which includes reasonableness according to professional norms and all the circumstances of the particular case." *Id.* ¶ 15, 908 A. 2d at 638 (citation and quotation marks omitted). Thus, "strategic and tactical decisions by defense counsel must be manifestly unreasonable to result in a new trial based on ineffective assistance of counsel." *Id.* To show that counsel's conduct fell outside the range of reasonable professional assistance, petitioner must overcome the presumption that under the particular circumstances presented, the challenged actions may be considered sound trial strategy. *Strickland v. Washington*, 466 U.S. 668, 687-88, 689 (1984).

Tucker argues that the court should consider the presumed prejudice standard set forth in *United States v. Cronic*, 466 U.S. 648, 661-62 (1984), rather than the *Strickland* standard. In *Cronic*, the Supreme Court recognized a narrow exception to *Strickland* when counsel entirely fails to subject the prosecution's case to meaningful adversarial testing . . . [such that] the adversary process itself [is] presumptively unreliable." *Cronic* at 659. Tucker argues that trial counsel utterly failed in defending him. Although he chose a reasonable defense strategy, trial counsel failed to use available evidence to support the defense theory and, in this manner, abandoned petitioner in presenting a defense. Tucker contends that defense counsel's failure to follow the strategy created the lack of a real adversarial process. Petitioner maintains that,

> The choice to argue that "Rodney says" he did not have sexual contact or commit an assault was not unreasonable. What was unreasonable was to create a

4

reasonable strategy and then not use any of the statements to support the defense and choosing to prevent the defendant's testifying, leaving a defense with no evidence or support when there was much such evidence that could have been used. This is not an attack on the strategy per se but upon the utter failure, at trial, to follow through.

Pet.'s Mem. at 18, n. 1. The court concludes that *Cronic* is not applicable because defense counsel did not fail to subject the prosecution's case to meaningful adversarial testing with what was available to him and within the applicable rules. Even if the court were to find fault with defense counsel's choices, petitioner has failed to establish that but for counsel's alleged ineffective assistance of counsel, the jury would not have found him guilty. See *Gauthier v. State*, 2011 ME 75, ¶20, 23 A.3d 185, 190.

B.     Prejudice

1.     The State's Case

The evidence presented at trial disclosed the following: In July 2007, the victim was staying temporarily with her friend, Kristin, and Kristin's family in an apartment complex in Portland, having just moved there from her boyfriend's Chestnut Street apartment. The victim attended Portland High School and worked as a store manager. On the afternoon of July 10, 2007, the police were called to the apartment complex on a matter unrelated to this case. Rodney Tucker, who was also at the complex, but not at Kristin's apartment, assaulted one of the officers. The police arrested Tucker, then twenty years old, and told him and the gathered crowd, including the victim, that he should not return to that apartment complex.

A few hours later, after it was dark, the victim was outside Kristin's apartment when Tucker reappeared. The victim knew Tucker from weekend parties at her boyfriend's apartment, from the Preble Street Shelter and at the Teen Center. The victim

5

considered Tucker a friend. The victim approached Tucker, and, noticing that he was drunk, asked Kristin if Tucker could spend the night. Kristin said no, so the victim told Tucker she would walk him part of the way back to his house to help him avoid further trouble with the police. As they walked, Tucker told the victim that he knew a shortcut, which was a path through some woods. The victim walked in front of Tucker on the unlit path to prevent him from tripping. Tucker said the victim's name, she turned around, and he punched her in the right side of her face near her eyebrow and across her cheek to her ear. The punch ripped out a safety pin in a new piercing on the victim's ear. The victim lost consciousness and fell down. When the victim regained consciousness, her head was up against a tree and Tucker was crawling on top of her. The victim's pants and underwear had been pulled down and Tucker's pants were around his ankles. The victim told Tucker to stop, but he held her down and put his penis inside her.

During the assault, the victim was able to push Tucker off her and run back to Kristin's apartment. Initially, the victim was crying so hard that Kristin had difficulty understanding what had happened. Kristin saw that the victim's glasses were bent and that she had a bruise on her eye, a cut on her ear, and her lip was bleeding. Kristin called the police. The police arrived, finding the victim hysterical and crying with a bloody nose and swollen right eye "like it had been hit." Several officers searched the path where the victim said she was sexually assaulted. They found no evidence of the crime, but an officer testified that the path was well beaten down and would not have left disturbed dirt or marks. Meanwhile, the victim was taken to the hospital where a nurse examined her and completed a sexual assault kit. In addition to offering the testimony of the victim, Kristin, the two officers who responded to the call, and the nurse who performed the

6

victim's sexual assault kit, the State called a forensic chemist who had analyzed the contents of the kit. The chemist testified that swabs taken from the rape kit revealed no presence of sperm or prostate specific antigens.

A few hours after the assault, police located Tucker walking in the area of the victim's residence. He was wearing clothing that matched the description provided by the victim, and he otherwise matched the physical description she had provided to police.

2.    The Defense's Case

From the beginning, Tucker maintained his innocence. The defense theory was that a consensual non-penetration encounter occurred between Tucker and the victim. Tucker thought that his defense counsel was going to push for a plea to a simple assault. The State's offer before trial was to plead to a Gross Sexual Assault, Class A, for 12 years, all but a 5-year cap, and 4 years of probation, or an agreed upon 11 years, all but 4 years suspended and 4 years of probation. Trial counsel conveyed the State's offer to petitioner, who testified at the PCR hearing that he would only consider pleading to a misdemeanor.

Thus, a two-day jury trial occurred in February 2008. Defense counsel's bill for services disclosed he devoted 13.5 hours in trial preparation,[1] he obtained funds for and hired a private detective. (PCR Pet.'s Ex. 4.) The private detective's bill revealed that he spent 12 hours interviewing potential witnesses, including the defendant. The private detective's report disclosed that a Jennifer Ramsdell told him the victim was promiscuous,

---

[1] Defense counsel submitted a bill for all services provided to Tucker in the period from July 12, 2007 through May 19, 2008, following sentencing. The total bill disclosed the expenditure of 68.10 hours, for $3,405. During the relevant time period, the Judicial Branch allowed a maximum of $2,500 for a Class A felony, including a jury trial. State of Maine Supreme Judicial Court, Administrative Order JB-05-05 (A. 7-08). Presumably, the maximum allowable fee bears some relationship to what the court expected a reasonably competent attorney would expend in a criminal defense of a Class A felony.

7

very deceitful, she made false accusations against people and the victim had been in a previous physical altercation. (PCR Pet.'s Ex. 3.) His report disclosed that he also interviewed Dustin Howard whose information was similar derogatory information that Ramsdell mentioned. (PCR Pet.'s Ex. 3.) Howard further told the private detective that he saw the victim involved in a fight before July 10, 2007. (PCR Pet.'s Ex. 3.)

Defense counsel opened with the following,

> And I don't think you are ever going to reach the point where you are almost certain because the evidence in this case is a lot more murky than Ms. Elam would have you believe. There is a lot of inconsistencies. There's stories that are told one way and then another. Rodney says that what happened is he was there with Jennifer and they were walking through the woods and there was some romantic contact, but they had not had sex, and they were close to having sex and then Jennifer said no, I don't want to do this, let's wait, let's do it tomorrow. And Rodney said okay and he stopped. And she walked back and he walked away.
> Where she got the bruises, I don't know. Did she fall down on the way? I don't know. But you will hear her story, you will hear Rodney's story, you will hear some other witnesses testify about the two of them, the credibility of the witnesses that you are going to hear, and it you job to judge the credibility of witnesses. And when you have had that opportunity to hear all of the evidence and to judge the credibility of all the witnesses, then I'm confident that you are going to find that the State has not met their, that you are almost certain that Rodney is guilty, and you will have to find him not guilty.

(T.Tr. 15-16.) He placed before the jury the question of credibility and the idea that this was a consensual interaction. At the time defense counsel opened, he did not know whether the State would use Tucker statements to police or, alternatively, how he might get in defendant's theory about the case.

Defense counsel cross-examined the State's witnesses trying to attack their credibility or elicit evidence that helped the defense. Defense counsel did not effectively shake the victim's testimony about the assault, except with respect to which hand the perpetrator used to punch her. Defense counsel effectively showed that the victim did not see which fist Tucker hit her with. The victim testified that she suffered injuries to the

8

right side of her face, her right eye and right ear and she assumed he used his right fist. The victim denied knowing Carrie Morrisette or telling either her or Molly Whyte that she had lied about Tucker raping her. (T. Tr. 77-78.) Defense counsel did not cross-examine the victim or Kristin about what they saw happen in the earlier encounter on July 10, 2007 between Tucker and the police. Their stories of the event earlier in the day went unchallenged. Defense counsel may have strategized that it was better to not draw the jury's attention to these earlier events on July 10, 2007. Defense counsel effectively cross-examined Officer Ruth's statement that the perpetrator punched the victim twice, getting her to admit that he punched her only once. (T. Tr. 128-29.) Defense counsel further elicited from the forensic chemist that all swabs that she tested did not have any evidence of sexual assault and that the fingernail swabs of the victim disclosed no evidence. (T. Tr. 184-85.)

In the defense's case-in-chief, counsel attempted to call Jennifer Ramsdell to testify about the victim's character. However, after *voir dire*, the trial judge concluded that Tucker had failed to meet his burden to establish a sufficient factual foundation to permit Ramsdell to testify as to the victim's reputation for untruthfulness in the community. Thus, Ramsdell's testimony about character was excluded.[2] Better preparation of the witness is unlikely to have resulted in a different outcome. This witness's knowledge of the victim's reputation was limited to an insular group of young adults who shared the same narrow types of experiences with the victim, who believed the victim lied in specific instances. Defense counsel did not call Jennifer Ramsdell as a witness on any topic. It does not appear that she had any additional testimony to offer

---

[2] The trial court's decision to exclude this witness' testimony was affirmed by the Law Court. *State v. Tucker*, 2009 ME 38.

9

since she did not allege the victim admitted to her that she lied about Rodney Tucker raping her.

Defense counsel called Carrie Lynn Morrisette who testified that the victim said that her boyfriend found out that she had slept with Tucker and she told him she got raped because her boyfriend beats her up and she was afraid to let her boyfriend know that she cheated on him. (T. Tr. 207.) The prosecutor's cross-examination of Morrisette was extremely effective on a number of grounds. First, the prosecutor queried how likely is it that the victim would tell this story to Morrissette within two days of meeting her. (T. Tr. 212.) Second, the prosecutor questioned the recency of this allegation by asking, why are we only learning about this alleged lie now? (T. Tr. 214.) Morrissette defended the story by alleging that Molly Whyte was present at Tommy's Park and she, along with 30 or 40 other people, might have heard the victim say this. (T. Tr. 223.) Third, the prosecutor elicited from Morrissette that the victim made this statement when Morrissette arrived at Tommy's Park, saw the victim there, started arguing with the victim and said, "I can't believe you would say this about Rodney . . . and [you] should not make up false accusations." Finally, the prosecutor established that Morrissette did not know that the victim's "false accusations" came with bruises on victim's neck, injury to her ear, the victim running hysterically into an apartment asking for help, the victim having a four-hour rape examination at Maine Medical Center, the rape having occurred in the woods, or the victim having slept with him this one and only one time. Further, Morrissette admitted that she never said to Tucker, "you had sex with Jennifer? . . . That's what Jennifer is saying, you had sex with her, is that right, Rodney, you never asked him that. . . And did you immediately report to Rodney that she had told you that?" (T.Tr.

10

218-222.) As the prosecutor summed up Morrissette's testimony, "This girl who you met one time before who knew that you were friends with Rodney who knew that you were angry at her for telling about Rodney then decided to tell you that she had lied, is that what you want us to believe?" (T. Tr. 220.) The prosecutor's cross-examination disclosed that defense counsel never met in person with Morrissette, she only talked with him on the phone, and defense counsel never met Molly Whyte who was suppose to come with Morrissette to the trial but did not. These facts may have insulated defense counsel from knowingly offering false testimony. See M.BarR. 3.7(b), (e)(1)(i)(2007).

Defense counsel rested without calling Tucker to the stand. This is one of the ways in which Petitioner claims he was prejudiced by defense counsel's performance.

### 3. Tucker's Claims of Prejudice

Tucker testified at the PCR hearing that he was prejudiced because defense counsel did not (1) introduce photographs of him with hickies or marks on his neck; (2) use his statements to the police or his testimony of his version of the events; (3) present testimony about the victim's earlier altercation; (4) present testimony that his dominant hand is his left hand and the victim testified that Tucker used his right hand to punch her; and (5) present witnesses who would testify that victim admitted at Tommy's Park that her story of rape was a lie.

To meet his burden he must affirmatively prove prejudice. *Francis v. Maine*, 2007 ME 148, ¶ 8. "This requires a positive showing rather than mere conjecture." *Id*. It also means in the context of a trial that petitioner must show a reasonable probability that but for counsel's alleged ineffective assistance of counsel, the jury would not have found him guilty. *Gauthier v. State*, 2011 ME 75, ¶ 20, 23 A. 3d 185, 190.

11

Tucker has not shown that additional witnesses and preparation of the witnesses might have changed the outcome. As for the photograph of him with hickies, he never mentioned this photograph in any of his statements to the police or his lengthy letter to his attorney that such a photograph existed or that he had hickies on his neck. Defense counsel effectively cross-examined the victim to show that she did not know which hand punched her. There is no evidence that Jennifer Ramsdell heard the victim say she lied about Rodney raping her, and the evidence concerning Morrissette's testimony that the victim admitted lying about Rodney Tucker was simply not credible by the time the prosecutor finished with her. Whether the victim may have had a prior altercation with a third party was not relevant to the case at hand. In terms of failing to obtain Dustin Howard as a witness, he was at the time of the rape the victim's boyfriend. (T.Tr. 56-57.) The private investigator's report did not describe any evidence that would have exonerated Tucker. Notwithstanding whatever information that Tucker believes Howard had, the private investigator's report indicated that his knowledge was similar to that of Ramsdell and defense counsel subpoenaed Howard but he failed to show. Even if defense counsel had met with and prepared Ramsdell and Morrissette for their trial testimony, no preparation could have prepared Morrissette or Ramsdell given the lack of any substance to their testimony.

Tucker testified at the PCR hearing that he wanted to testify so that he could tell the jury he was innocent. Tucker thought that if he could tell his story, he would have raised reasonable doubt. He claimed to have photographs and other witnesses to support his testimony. Tucker testified that it was "just her story against mine" and if one "just looked at the pictures [of her] there really is nothing there." However, those photographs

12

disclose a bruise on her right cheek, a very red right ear and fresh cuts under her nose and on her chin. (PCR State's Ex. 1, 2.) Those photographs support the victim's story, not Tucker's story.

Tucker's story is contained in a written statement[3] and an oral statement[4] made to police. He claims that they stopped short of intercourse, the interaction was consensual and she gave him hickies, which he says his photos if blown up would corroborate. The statements were not used by the State and defense counsel could not have introduced them because they are inadmissible hearsay. Notwithstanding petitioner's expert, there is no basis for the admission of these statements, unless defendant testified and then the prosecutor could use those statements to cross-examine him. The only way for Tucker to get his story before the jury was for him to take the witness stand, but that was not without its problems. At the outset of his representation of Tucker, defense counsel

---

[3] The police brought the petitioner to the police station where he provided a handwritten statement after being asked by an officer what he had done that entire day. Summarizing Tucker's statement, Tucker wrote that after drinking at length that day he was told by police to leave the victim's apartment complex because he was arguing with police over the removal of an unrelated baby from that building, he left, got a ride home, then went back to check on a friend at the apartment building who turned out to be in jail, then he walked off and ran into the victim, who he said he used to party with back in the day, that her name was Jen, and she was 18 or 19. Tucker said Jen was really upset because her brother had died so he stuck with her and they ended up making out for a few minutes. She gave him her number, he walked her back to the apartment complex, she went her way, he went to another friend's and slept on their hardwood floor, but he couldn't sleep so he decided to walk home and on his way he got stopped by the Portland Police. (PCR Pet.'s Ex. 1.)

[4] Police reports reflect that Tucker orally told the police at that time, although he did not write such in his statement, that the victim had to go to the bathroom so they walked into the woods, they were both very intoxicated, she could not get her pants off so he helped her, she went to the bathroom and put her pants back on. They began to make out, eventually ending up on the ground. They were touching each other and both pulled their pants down. They were about to have sex when the victim asked if they could "finish tomorrow." They stopped, pulled their pants up. There was no contact between his penis and her vagina at any time. She gave him her number and asked him to call her, and he walked her back to the area of her apartment, and he walked off. He also told the police that he was recently a suspect in another sexual assault, involving Sherri York, but that those charges had been dropped. (PCR Pet.'s Ex. 5.)

13

instructed Tucker that he never put his clients on the stand and, according to Tucker, would not put him on because "he was not ready for Meg['s cross-examination of him]."

The failure of counsel to prepare and call Tucker to testify raises the question whether Tucker has been deprived of a substantial ground of defense. A substantial defense is not limited to an affirmative defense or an alibi defense. It includes "admission of evidence that 'substantially will discredit the government's case-in-chief' and a substantial defense is lost if counsel fails 'to impeach a key government witness with highly credible evidence.'" *Whittemore v. State*, 670 A. 2d 394 (Me. 1996)(citation omitted). Petitioner did not have a key witness with highly credible evidence. Defense counsel tried to make the credibility of the victim a key issue; however, he was unable to successfully impeach the victim during the trial.

Tucker's entire defense rested on creating in the minds of the jurors a reasonable doubt that the victim was credible in her statement that Tucker had raped her. The state's case had included the victim's testimony, the first report of Kristin, victim's statements to the medical providers, the observations of the medical providers and law enforcement, together with photographs of her fresh injuries, all of which corroborated the victim's testimony. There was no forensic evidence to link Tucker to the rape, but Tucker admitted he was with the victim that night. The only issue was did Tucker rape the victim. The State's evidence established beyond a reasonable doubt that he did. If Tucker had testified he would have testified that she had to go to the bathroom, he helped her because she could not pull down her pants, she put her pants back on, they began to make out, ended up on the ground, took their pants off, and were about to have sex when the victim asked if they could "finish tomorrow." This story is incredible. This story

14

presented in the context of the other evidence in this case does not support a reasonable probability that the jury would have found Tucker not guilty if he had testified.

Generally speaking, it is the jury's prerogative to determine the relative credibility of the victim and the defendant. In this case, the resolution of credibility would require weighing the testimony of the victim and Tucker and any evidence that corroborates either of their testimony. There is ample evidence to corroborate the victim's testimony. There is no evidence that corroborates Tucker's testimony, except that there were no forensic findings from the rape kit. This court cannot say that highly credible evidence was lost when Tucker elected not to testify. Under these circumstances, the court concludes that trial counsel's performance did not fall measurably below that of an ordinary fallible attorney and that Tucker was not deprived of an otherwise available substantial ground of defense.

Judging defense counsel's performance from the substantially heightened deference of *Strickland* and its progeny of cases, defense counsel's strategy has not been shown to be manifestly unreasonable. The court cannot say that defense counsel should have called Tucker to testify in his case. Defense counsel had the dual and possibly conflicting ethical rules that he not knowingly offer false evidence, M.BarR. 3.7(b), (e)(1)(i)[5], and that he should not represent a client without adequate preparation, M.BarR. 3.6(a)(2)[6]. There is no ethical rule that requires that defense counsel prepare his client to

---

[5] Petitioner's expert testified that the Maine Commission on Indigent Legal Services (MCILS) standards require defense counsel to prepare defendants to testify and to at least attempt to introduce a client's statement despite this historically constituting hearsay evidence. Although these standards were not in place in 2007 and 2008, the expert testified that they existed in an uncodified form. The MCILS standards are found at www.Maine.gov/mcils/. See MCILS 10.3(A) about defense counsel not knowingly offering inadmissible evidence.
[6] See MCILS10.4(D) providing that "[d]efense counsel should prepare all witnesses for direct and public cross-examination."

15

testify, but rather the requirement is that he "must employ reasonable care and skill and apply the lawyer's best judgment in the performance of professional services." M.BarR. 3.6(a)[7]. It may well be that defense counsel's best judgment was that putting Tucker on the stand in light of the prosecutor's extraordinary cross-examination skills and the far-fetched story of Tucker would have been disastrous for the defense and constituted a violation of Bar Rules that he not knowingly put on any false evidence.

The trial court discussed with Tucker on both the first[8] and second day[9] of trial his right to testify. The colloquies between the Trial Court, Tucker and his defense attorney

---

[7] "Defense counsel should discuss with the client all of the considerations relevant to the client's decision to testify." MCILS 10.4(A). And, although Standard 10.4(C)(1) states that defense counsel should "develop a plan for direct examination of each potential defense witness", Standard 10.3(A) states that "[d]efense counsel should not knowingly offer false evidence, whether by documents, tangible evidence, or the testimony of witnesses, or fail to take remedial measures upon discover of its falsity."

[8] The colloquy on the first day was as follows:

THE COURT: All right. I want to speak to your client, okay, in regard to whether or not he wishes to testify.

MR. O'BRIEN: Okay.

THE COURT: If you elect to testify, Mr. Tucker, that's your right to do so. The state is free to cross-examine you and challenge you with anything that is legally admissible. If you elect not to testify, I would instruct the jury that they are not to draw any inference from the fact that you have not testified. However, they can consider anything you may have said in the past or anything anyone said about your situation. The decision to testify is your decision and your alone. You should listen to your counsel and consult with your counsel. When we come back from the break, before the jury comes back in, I will make further inquiry as to whether or not you are going to elect to testify. Do you have any questions about that?

THE DEFENDANT: No, I would jut like to consult with him before I make a decision.

THE COURT: Certainly.

MR. O'BRIEN: Your Honor, as far as that goes, I have three witnesses that I think will easily take us to 4:00 o'clock. I think this first witness you are going to want to voir dire of because I'm going to try to get in some evidence under 608A and I think the prosecutor probably wants to find out exactly what she has to say.

THE COURT: So this decision may be made overnight then with regard to whether your client is going to elect to testify.

MR. O'BRIEN: Exactly.

THE COURT: All right.

(T.Tr. 187-188.)

[9] The next day the colloquy continued on the subject of the defendant testifying:

16

undermine petitioner's claims that defense counsel did not discuss the details, rights or ramifications of his decision to testify in his own defense. One does not know what the off-the-record conversation was between defense counsel and Tucker, but one can easily imagine that defense counsel did not want him to testify because of counsel's obligation not to put on false testimony. See M.BarR.3.6(d)(2007), 3.7(b), (e)(1)(i)(2007). Given what the prosecutor did to the two defense witnesses, it is just as likely that Tucker would not survive a blistering cross-examination by her in light of his prior inconsistent statements to the police and his statement that he had been a suspect in another sexual assault, but those charges had been dropped.

---

THE COURT: All right. Having said that, I want to go back to your client and whether or not he elects to testify. I want to go ahead and with specificity tell him exactly what I would tell the jury if he elects not to testify. The fact that the defendant in this case, Rodney Tucker, chose not to testify is not evidence. Under our law, he has an absolute right not to testify. You are not permitted to speculate or try to guess why he did not testify. When you are deliberating and making your decision, you may consider any statement made by the defendant that you heard about from the witness stand, but you are to assign no weight whatsoever to the fact that he did not testify.

That is what I would instruct the jury if you elect not to testify. The decision as to whether you testify or not is one that you should consider carefully and consult your attorney about. Do you have any questions?

THE DEFENDANT: No, sir.

THE COURT: And can you – are you prepared to tell me now whether or not you wish to testify or elect not to testify?

THE DEFENDANT: My attorney advised me not to testify, so I'm going to go with his word on that.

THE COURT: All right. Your attorney is here to provide you advice. Ultimately, it's your decision.

THE DEFENDANT: Yes, sir.

MR. OBRIEN: I told him that. I went over that quite thoroughly, that despite the fact that I advised him that I thought it would be best if he didn't testify, that it's his decision and nobody can take that away from him. And I think what he is saying is he has decided to go with my advice.

THE COURT: Is that correct?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. So you elect not to testify.

THE DEFENDANT: Yes, sir.

(T.Tr. 233-235.)

17

Tucker testified at the PCR hearing that his attorney did not discuss testifying at the end of the first day or the morning of the second day of trial. Indeed, it is Tucker's testimony that his defense counsel never discussed testifying with him, other than to say, "I never put my clients on the witness stand." Yet, the court discussed the election to testify thoroughly with Tucker, advising him that it was his decision to make and describing what the court would say to the jury about his testifying or not testifying. There could be no doubt in Tucker's mind after the colloquy between him and the judge that while he was to consult with his attorney, the decision was his to make. There is no evidence that Tucker's waiver of his right to testify was anything but voluntary. Petitioner knew from the trial court's statements to him that he had a constitutional right to testify or to not testify and the choice was his. The competence and soundness of defense counsel's advice that he not testify reflects a strategy that defense counsel concluded that Tucker's testimony could hurt him and affect him if he were convicted and faced sentencing as a defendant who perjured himself and showed no remorse. The court rejects PCR counsel's statement that it can be inferred that the decision to not have petitioner testify was done on the basis of failure to prepare. (Pet.'s Mem. at 11.) This was a very seasoned trial attorney and his decision could just as likely have been based on defense counsel's decision to not present testimony that he knew or believed to be perjured.

Understanding that this would be a difficult case to defend, trial counsel's opening statement is just as likely to have been made in an effort to place Tucker's story in front of the jury early in the game when he did not know whether the state would use Tucker's statements to police or whether it would be strategic to call Tucker to the

18

witness stand later in the trial. Defense counsel's opening to the jury did not promise that Tucker would testify but rather alerted the jury to listen for inconsistencies in testimony and that it was Tucker's position that this was not a rape. Defense counsel's opening at this early stage of the trial is not so clearly below that expected from an ordinary fallible attorney faced with such an unconvincing defense. Unfortunately for Tucker, the state of the evidence did not support his taking the stand and telling his story. Counsel could not use his police statements in lieu of Tucker's testimony because any experienced attorney such as defense counsel would know that the statements were inadmissible hearsay. Without having a credible story to tell, counsel could not put Tucker on the stand and risk his being in a worse position than if he did not take the stand.

The overall fairness and justice of this representation in the case at bar does not fall short of what a reasonably competent attorney's performance would be. Defense counsel's performance does not disclose serious in-competency, inefficiency, or inattention. Rather, defense counsel's performance demonstrate that he did the best he could with an implausible defense.

The entry is:

Petition DENIED.

Date: June 11, 2013

Joyce A. Wheeler, Justice
Maine Superior Court

19