STATE OF MAINE
KENNEBEC, SS.

SUPERIOR COURT
CRIMINAL ACTION
Docket No. CR-14-56

DANIEL FORTUNE,

     Petitioner

v.

**ORDER**

STATE OF MAINE,

     Respondent


Petitioner was convicted upon jury verdict in a trial conducted in Somerset County on multiple counts of aggravated attempted murder, attempted murder, and related offenses. The petitioner pled guilty to theft, failure to appear, and violation of a condition of release prior to trial. On the aggravated attempted murder and attempted murder convictions he was sentenced to life in prison. The defendant appealed the conviction. The Law Court denied the appeal holding that the conviction of attempted murder could be based upon a jury's finding that the State proved all elements of the attempted murder as to one of the three victims named. They were not required to find all elements of attempted murder as to all three victims in spite of being named in a single count indictment. The court also determined that the aggravated attempted murder statute does not violate State or Federal Constitution by providing for the imposition of a sentence of life in prison rather than a term of years.

Petitioner initiated his petition for post-conviction review in August of 2012. Petitioner alleges incompetent assistance of counsel relating to discovery regarding State witnesses, hiring of private investigator, and allowing petitioner to plead guilty to theft and other charges. Upon his request, counsel was assigned in September of 2012. The case was assigned to a Superior Court Justice. An amended petition was filed in October of 2013.

In that petition, defendant's counsel asserts that the petitioner was deprived of his Fifth Amendment right against self-incrimination. He was not informed by the court or his counsel of his right not to testify and a jury instruction that his silence could not be considered evidence. Petitioner next challenged the court's jury instruction that did not require the jury to unanimously find the petitioner guilty of all three named victims in the charge rather than a single victim. The petitioner complained that trial counsel failed to present mitigating evidence at sentencing and alleged that the was deprived of his right under the Eighth Amendment to the U.S. Constitution prohibiting cruel and unusual punishment by the imposition of a life sentence for crimes other than murder and committed as an accomplice. Petitioner complained of discovery violations by the State.

The petitioner alleged that he was denied his right under the Confrontation Clause of the U.S. Constitution when the allocution at sentencing of his

2

codefendant was read to the jury in the absence of the codefendant.[1] He complained that the empaneled jury was Constitutionally deficient in that no members of a minority race like himself were chosen. In sum, he petitioned this court to find that trial counsel and appellate counsel were inadequate in not pursuing all these issues during this criminal litigation and had they done so, he would have been acquitted of the charges.

Hearing on the petition was conducted by the court in November of 2014. At the post-conviction hearing, petitioner asserted five allegations of matters to be reviewed by this court. First, he complained that he was not afforded proper counsel regarding his right to testify or not to testify and therefore his decision to testify was highly prejudicial based upon his ignorance of his rights. Secondly, he asserted a violation of his Sixth Amendment rights by virtue of defense counsel not insisting the court instruct the jury that it must find attempted murder on all three persons named in a single count of the indictment rather than a single victim. Third, he argued violation of his Eighth Amendment rights in the imposition of a life sentence for attempted murder. Fourth, he argued that he was denied his Constitutional right of confrontation when his codefendant's statements in allocution made at the time of codefendant's sentencing was read to the jury during

---

[1] Leo Hylton participated in the criminal incident. He pled guilty and was sentenced prior to Fortune's trial.

[2] Mr. fortune was indicted in Kennebec County for the offenses which occurred in Pittston. Upon request of defense counsel founded upon substantial pretrial

3

Mr. Fortune's trial. Finally, he complained that he was denied a jury of his peers inasmuch as the trial was not transferred to a county with a significant minority population sufficient to ensure that at least one member of the trial jury would be of a minority.[2] He asked for review of the performance of both trial and appellate counsel for adequate effectiveness.

The parties stipulated to a statement by appellate counsel as to the basis upon which he brought particular issues to the attention of the appellate court. Appearing as witnesses at the post-conviction hearing were Mr. Fortune, the petitioner, his defense counsel at trial, and a local retired attorney who assisted defense counsel, offering to do so as a former neighbor and family friend of Mr. Fortune.

Petitioner testified that he had a number of conversations with his defense counsel in meetings at the jail, exchange of mail, and phone calls. He testified that he made it clear to counsel that he would not testify. He was very involved in the preparation for trial. He insisted that counsel did not tell him about his right not to testify or that the judge would instruct the jury that his failure to testify was not evidence.

---

[2] Mr. fortune was indicted in Kennebec County for the offenses which occurred in Pittston. Upon request of defense counsel founded upon substantial pretrial publicity, the case was transferred to Somerset County where the trial was held. Upon petition for post-conviction review, the case was returned to Kennebec.

4

Mr. Fortune testified that on May 13, at 11:40 a.m. the State rested. He said that he, defense counsel, and co-counsel, went into a room where they discussed the future of the trial. He said that his counsel told him that they had beat the attempted murder charge and that they needed to talk about the robbery charges. He insists there was no preparation as to what questions would be asked if he testified. He admitted that he decided to testify because he wanted to go home as he was assured that there was no attempted murder case for the jury because the evidence was clear that he would "beat the charges." Later with co-counsel, during the lunch hour, he pondered the question, thinking about what to do. He testified that he couldn't remember during the conversation whether there was a discussion about the jury being advised not to consider his not testifying as evidence. He insisted that there was no discussion of the risk of testifying, but he said that he decided to testify because he had "everything to gain and nothing to lose." He said he did not want to testify, that he was afraid of the questions that he did not want to answer and did not want to talk about. He said that the judge did not advise him about his right not to testify and they didn't have time to think about it as it was just during the lunch hour.

Petitioner testified that he was a native of Haiti and was aware that there were more black people living in urban southern Maine than in Kennebec County. He suggested to counsel that the trial be changed to Cumberland, Androscoggin, or

5

York County. He allowed that his counsel did make a motion to change venue, but the trial justice decided it would be transferred to Somerset making some reference to the fact that it should be in an adjoining county. He understood his counsel brought the motion to change the venue based on pretrial publicity. He did not agree with a willingness not to insist that it be moved to Androscoggin, Cumberland, or York Counties before jury selection. He admitted that counsel objected to the make up of the jury based upon the lack of colored minority at the time of jury selection.

Upon cross-examination, petitioner reiterated that prior to trial that he was insistent that he would not testify, that his counsel told him that she could not make him testify, and that if he took the stand and was asked "Did you do it?" that he would answer "No" and that the concern was that the next question would be "Who did it?" He did not want to open the door to assisting the State in the prosecution of his codefendant. Upon his entering a plea to the charges not tried, he continued his, "I was willing to admit to what I did but would not admit to what I did not do." He admitted at the Rule 11 proceedings where he pled to theft and other charges in advance of the attempted murder trial that he was advised by the justice of his right to remain silent and that he could not be forced testify. He further admitted that any decision whether to testify was his and his alone.

6

Trial counsel then testified at length that she was a lawyer with thirty-four years experience, including fourteen years in the District Attorney's Office and five years with the Attorney General's Office. She made clear the number of times she counseled the petitioner on his right to testify. She also told him to stop talking to anyone, particularly the press. She acknowledged that he was adamant that he would not testify against the codefendant and did not expect the codefendant to testify against him. When discovery appeared that placed the defendant at the scene of the crime, the State attempted to have Mr. Fortune testify against Mr. Hylton. Trial counsel testified that at this point she again discussed with him his right to testify or not testify and counseled that it was not in his benefit to do so.

Trial counsel allowed that one element in favor of testifying was that he could explain why he was at the scene of the crime. She did point out to him that there was really no other way for him to get his story into the trial before the jury except by testifying. She testified she also discussed with him all the negative aspects of testifying, including the requirement to answer all questions once he has taken the oath on the witness stand, but made it clear that he had an absolute choice not to do so and that the jury could not make any inference from his silence. She testified that they had conversations about the subject every day during the trial.

Counsel testified that at a noon break, after the State had rested, she went over possible trial testimony with Mr. Fortune and raised the question whether he

would testify. Counsel insisted she conducted a mock examination with the petitioner and he again insisted he would not testify. She then left for lunch and defendant petitioner stayed with co-counsel to think about it. When trial counsel returned she said that Mr. Fortune told her that he wanted to "tell his story," that he really wanted the jury to believe that he only went to the scene to get his codefendent, Mr. Hylton, out of the house.

Trial counsel supported her testimony by testifying that she had examined her billing statements and noted there were eight meetings with petitioner at the trial, seven at the Kennebec County Jail, and one in Somerset. There were twenty phone calls, fifteen letters by her to Mr. Fortune, and nine letters by the petitioner to her.

She noted that the motion for change of venue was based upon pretrial publicity. The victim was very well known in the Augusta area having formerly represented the District in the Legislature. She said there never was a discussion of race or any move to Cumberland, Androscoggin, or York based upon race. To the extent that there was a discussion of change to Cumberland, she said it had nothing to do with race. Counsel testified that at the close of jury selection, when asked if the jury was acceptable, she raised the issue of the lack of persons of color.

As to the confrontation issue, trial counsel indicated that she objected to the reading of the sentencing allocution transcript of the codefendant, but did not think

8

there was a confrontation issue because the codefendant did testify at Mr. Fortune's trial. Even though refusing to remember most details, Mr. Hylton was physically available.

Co-counsel testified that he contacted trial counsel upon discovering that Mr. Fortune had been indicted in order to offer his assistance. Mr. Fortune had grown up with a foster family as a neighbor of co-counsel. Co-counsel testified that he assisted in planning the defense including discussions of a plea agreement and the role of testifying. He was present in the conversation between trial counsel and the petitioner on May 13 at noontime, listening to their discussion. He testified that trial counsel understood the defendant's story and made it clear that the decision to testify was entirely Mr. Fortune's. She asked numerous questions of the petitioner of his version of the events. It then developed that Mr. Fortune expressed a desire to tell the jury what happened.

A complete review of the transcript of the criminal trial reveals that on the third day of trial, Mr. Fortune's codefendant was called as a witness by the State. One year earlier, the codefendant had entered a plea of guilty to attempted murder, and a M.R.Crim.P.Rule 11 proceeding took place. As per Rule, the Assistant District Attorney presented to the court the evidence which he expected to present should the codefendant proceed to trial that would support a finding of guilt beyond a reasonable doubt. The evidence supported the conclusion that two black

men engaged in a home invasion where a father and his young daughter were viciously attacked with a machete and possibly with a knife. The codefendant agreed that the evidence would support findings of guilty on his charges and the following dialogue took place,

THE COURT: Alright. Mr. Hylton is there anything you would like to say in response to the prosecutor's statement of the evidence against you?

ANSWER: No, Your Honor.

THE COURT: Is there anything else you would like to say at this time?

ANSWER: No, Your Honor.

THE COURT: Are you pleading guilty because you are guilty and for no other reason?

ANSWER: Yes, Your Honor.

Essentially, the codefendant had admitted to the attacks on the father and the daughter. He further admitted conducting a walk-through of the scene that was videotaped which included a description of the attack of the father with the machete and subsequently the young daughter. The position of the codefendant was that he went to the residence with Mr. Fortune to assist Mr. Fortune in obtaining sufficient money so that Mr. Fortune could make bail on charges that were pending and for which there existed a warrant for his arrest. The assertion

10

was that he conducted the attack out of loyalty to his adoptive brother, Mr. Fortune, and to dispose of witnesses to the home invasion.

Sentencing procedure for the codefendant took place some eight months later in February of 2010. At that proceeding the codefendant presented a letter which he had written to the victims of the attempted murder. In addition, he made a lengthy allocution in which he essentially gave details of the incident establishing that Mr. Fortune had committed the assaults. He said he had simply been there to assist Mr. Fortune, and that his whole involvement was out of loyalty to Mr. Fortune who had the motive to undertake the home invasion. He said he would not have been involved if he had "just had the courage to stand up to my big brother, you know, which is what I considered him, and I asked him, and I grilled him about -- what his real intentions were, where we were really going, it never would have happened. I am truly, truly, sorry," he then apologized "Your Honor" for "lying to the court and wasting the court's time." Then he proceeded to state what he said "really happened that night."

He claimed that Mr. Fortune asked him to get a car so they could go to a place in Pittston. He understood Mr. Fortune's purpose for going to the location was to sell some marijuana. He stated that he waited by the car while Mr. Fortune went into the residence. When he heard the home security alarm go off he thought there had been some mistake. He was concerned that his brother was in trouble, so

he went into the house. He then described Mr. Fortune undergoing the attack on the father and how he then went upstairs and attacked the daughter. The thrust of the codefendant's testimony was that he was pleading guilty because he should have stopped Mr. Fortune's attack. He said, "In hindsight of course there was, there was a lot I should have done, there was a lot I could have done, but I didn't." It would appear, that he trying to assert that the purpose for his confession and for his video walk through of the scene of the crime was to take the wrap for his older brother, who he considered in his own way a blood brother.

When the codefendant appeared as a witness at the Fortune trial, he agreed that he had made statements and testified that he did not recall the vast majority of the information suggested by the examination by the District Attorney. Essentially, he didn't refuse to testify, he just took the position that he could not remember all of the things he had done.[3] On cross-examination, however, he agreed that he had written the letter to the victims' family which was defendant's Exhibit #1. He identified the handwriting as his own. When asked if he remembered writing the letter his answer was that he did not. Defense counsel then directed his attention to a particular point in the letter in which it says, "My weakness, my need to help those that I love. My unwavering loyalty has caused all

---

[3] Under oath, Hylton responded he could not "recall" or "remember" to 127 questions by the State and to 87 questions by the defense.

12

this senseless pain." When asked if he wrote those words he responded, "That's what it says."

The codefendant agreed that this letter professing loyalty to Daniel Fortune as causing all of the pain was delivered to the victims' family at his sentencing proceeding. When asked if the letter, in context, was to tell the court that his loyalty is what prevented him from stopping the attack, his response was, "I do not recall." Upon completion of that testimony, at the end of the trial day, the court addressed the codefendant saying, "Before you leave, Mr. Hylton, before you leave I want you to understand you are not finally excused from testifying." At sidebar, the District Attorney had requested that the court make that instruction to be sure that he could get the witness back to authenticate the video of the walk-through. The court then asked the question as to whether or not Mr. Hylton's failure to remember the incident made him unavailable to further testify and she solicited arguments from counsel on that issue.

The issue as envisioned by the court in chambers was whether other statements made by the codefendant may be admissible and, if so, under which rule of evidence, which hearsay exception, and whether or not it is hearsay at all. While trial counsel agreed that she was allowed to cross-examine the codefendant in this proceeding, she argued that she had not cross-examined Mr. Hylton in regard to the activities of each defendant during the attack. Because of the theory

that the witness was unavailable because he could not remember, the State and defense counsel agreed to the admissibility of the video walk-through, believing that there was a sufficient foundation under Rule 803-5 of the Maine Rules of Evidence for the State to put it before the jury.

The District Attorney then requested that the transcript of Mr. Hylton's allocution at the time of his sentencing be admitted under the same rule of evidence showing the jury what the codefendant's intentions were in his letter of apology. The witness did not remember making the statements specifically. He did not recall the events that were covered by the allocution when asked specifically what he did or what he said that he could not recall. The substance which he did not recall was his statement that the attacks were all conducted by Mr. Fortune.

Defense counsel argued that under M.R.Evid. 803-5 it must be shown that the statement was made or adopted by the witness when the matter was fresh in the witness's memory. She argued that at twenty-one months after the fact, he was testifying about something that, if you believe his testimony, he forgot between 5:30 in the morning and 10:00 in the morning, because at "5:30 in the morning he testified yesterday that he remembered the police coming to the house, and at that time -- point in time thereafter, he said he didn't remember anything . . . ." The defense essentially argued that what the witness said in this proceeding, which was not subject to cross-examination, did not meet any reliability test.

14

Weighing admissibility on the basis of impeachment, the State then introduced the theory of admission of the allocution under the Rule of Completeness regarding the letter the codefendant wrote to the victims' family. The State argued that it would not be proper for defense counsel to seek to introduce the letter as it would be out of context without also admitting the allocution. He argued the letter was part of the sentencing presentation at which Mr. Hylton was saying, "I'm very sorry, it was my loyalty to Daniel, I could have saved Nicole, I could have done this and I didn't." Defense counsel argued that she had not placed the letter into evidence, but only certain sentences from the letter which she read to the jury. She argued, "All I asked him was two specific clauses, whether those were -- whether he wrote those words, whether that was his writing." The court then asked, "Wouldn't the Doctrine of Completeness then allow them to put in other statements that he made in the letter and other statements he made in the proceeding even if the letter itself doesn't come in?" Defense counsel responded that she did not believe so. She argued that simply bringing forward the two clauses from the letter by way of impeachment did not open the door to the facts of the underlying case whether he remembers it or not. She argued that she did not ask him anything about whether he was there, what Mr. Fortune did, or what actually happened in the house. The State argued that for purpose of completeness, the transcript must show that Mr. Hylton was taking full

responsibility for what happened in the house by not stopping the attack by Mr. Fortune.

The court then made a ruling that "under the doctrine of completeness, that it is the same proceeding, it is the same day, it is the same judge, it is the same listener, and what he said in the Rule 11, as well as what is in the letter are admissible." Essentially, the court ordered that if the defense was going to offer and argue the statements in the letter, the State should have the opportunity to admit other statements in the letter as well as other statements that he made at the same time as part of the same proceedings. Trial defense counsel then objected saying that she would not argue anything from the letter. The court, however, noted that both State and defendant had asked questions about the letter, also noting that the letter was referred to in opening statements. Continuing her objection, trial counsel wanted to be clear that she was not offering the letter, that the letter was not before the jury and just the statements were in. The court responded that the statements that are "part of the sentencing proceeding I am finding fall within the doctrine of completeness as well . . . ." Most importantly, the court then ruled that the States's and defense's objections to the ruling were preserved. Trial counsel persisted that the letter was separate from the allocution.

In his letter to the victims, the codefendant did not apologize for committing the attack, he apologized for not preventing the attack by Mr. Fortune. The letter,

16

by itself, was contradictory to Mr. Hylton's Rule 11 admission of personally causing the attacks. Accordingly, the issue of allowing the transcript of his allocution at sentencing to be read to the Fortune jury was to explain why he was apologizing from preventing the attack by his "brother".[4]

Under the rule of completeness, the trial court must first determine if the partial evidence admitted has in fact created a distorted view of the evidence as a whole. If it has, the court must determine what additional portions of the evidence are necessary to cure the distortion. These decisions are discretionary. *State v. Anderson*, 230 Wis.2d 121. Upon direct examination by the State, Mr. Hylton admitted to pleading guilty to attempted murder on both the father and the daughter. When asked if he remembered when he pled guilty, he responded, "I may have, I don't remember." He was asked if he remembered addressing the court when he was sentenced and his response was, "Yes sir, I believe I did." He was then asked if he actually wrote a letter of apology to the family and he said, "Yes sir, I did." He was asked if he made it up, and he said "No sir." He was asked, "Is that true?" and his response was, "The words in the letter, yes, sir." When asked to repeat his response, Mr. Hylton said, "My letter was most definitely true, yes, sir." Then he was asked, "When you told the judge at your sentencing

---

[4] The court has gone to lengths to provide the activities at the trial because of the underlying assertion that trial counsel was unacceptably inadequate in her defense of the petitioner. Her performance is subject to review in this proceeding.

that it was not you, it was Daniel who has struck William and Nicole Guerrette, isn't that true?" Mr. Hylton's response was, "I do not remember that." While Mr. Hylton testified under oath at the Fortune trial that the words in his letter to the victims were true, he was not subject to cross-examination at the sentencing hearing. Whether, having adopted the letter at the Fortune trial, he was subject to cross-examination in that proceeding, and while he did not remember the answer the substantive question put to him by counsel at the Fortune trial, he was available to continue as a witness upon instruction by the court even when he completed his testimony as provided by the State.

The Sixth Amendment of the United States Constitution provides a defendant the right to be confronted with the witnesses against him. United States Supreme Court cases have remained faithful to the Constitution framers' understanding by holding admissible testimonial statements of witnesses absent from trial only where the declarant was unavailable and only where the defendant had had a prior opportunity to cross-examine. Testimony of statements by a witness, however, will be subject to evidentiary rules concerning reliability. The right to confrontation is not a substantive guarantee that evidence be reliable but a procedural guarantee that the reliability of the statement is tested by cross-examination. *Crawford v. Washington*, 541 U.S. 36. It is held that admission at a joint trial of a defendant's extra-judicial confession implicating a codefendant

18

violates the defendant's right of cross-examination secured by the confrontation clause of the Sixth Amendment. *Roberts v. Russell*, 392 U.S. 293. It is clear that trial counsel in the instant case preserved her objections on behalf of Mr. Fortune to the admissibility of the reading of the transcript of the codefendant's allocution during his sentencing proceeding.

The rule of completeness is a form of exception to the hearsay rule. The Confrontation Clause is a provision addressing the question of reliability of testimony. It is not a matter of reliability of testimony but a manner of testing reliability. See *Crawford v. Washington*, 541 U.S. 36. Under the facts of the instant case, Mr. Hylton's insistence on denying recollection of any of the details of his allocution, but agreeing to the truth of the statements in his letter to the victims raises the question of his availability for cross-examination. His presence in a room adjacent to the trial courtroom wherein he had been ordered by the court to remain available to testify raises the issue of opportunity for further cross-examination. The lack of confrontation to establish reliability of the allocution statement would render a conclusion that the statement was not reliable. But the statement did not need to be proven as true, only that it was a window into the intentions of Mr. Hylton.

In this post-conviction proceeding, the petitioner has offered a stipulation reached between he and the State regarding the performance of the appellate

counsel in this matter brought forth to the Law Court. Appellate counsel agreed that on his direct appeal to the Law Court "he did not assert a violation of Fortune's right under the Confrontation Clause of the United States Constitution by the admission at Fortune's trial of codefendant Leo Hylton's sentencing allocution which was read into the record at page 612 of Volume 1 trial transcript, nor did he assert a violation of Fortune's Constitutional right to an impartial jury of his peers on the basis that Fortune belongs to a minority, and that the venire did not consist of one minority." Counsel goes on to say that he did not discuss the confrontation with Mr. Fortune nor did he research it. He noted that there had not been an objection at trial based on confrontation and he believed that the standard of review would have been obvious error, which he, appellate counsel, "believed would have been difficult to meet and he did not want to put up a lot of what he considered losing issues before the Law Court when he thought he had some meritorious ones because he thought that would tend to obscure the meritorious ones.

The court is satisfied from the sworn testimony of the petitioner and the petitioner's trial counsel that he was fully advised of his rights regarding the Fifth Amendment protection. Counsel made clear the occasions in which such a right to testify or not was discussed including and up to moments before he actually took the stand. While the petitioner denies receiving such counsel, trial counsel substantiates her testimony with her review of her billing records and timesheets.

It is clear from a consideration of trial counsel's experience on both sides of the criminal law field that she recognizes and did then recognize the importance of advising her client in regard to his Fifth Amendment Rights. Further, the court finds the testimony of counsel more credible than that of the petitioner. Therefore, as a matter of fact, the court is satisfied that the petitioner's complaint of a failure of understanding of his testimonial rights is not supported.

Petitioner complains that trial counsel was inadequate and ineffective in not insisting that venue for the trial of the case be held in a venue where there was a sufficient minority population to make it reasonably likely that a member of the jury selected would be a member of a minority race. The petitioner has presented no evidence or suggestion of evidence that the makeup of the jury without a person or persons of color in any way effected the jury deliberations or its verdict. There is no evidence that the selection process was tainted by improper challenges or that Mr. Fortune was prejudiced by the jury makeup.

Petitioner argues that trial counsel failed to properly provide the trial justice with appropriate jury instruction language regarding the responsibility of the jury where three victims are cited in a specific attempted murder count, with the responsibility of finding all elements of the crime with regard to all three, rather than just one. Petitioner directs the court's attention to *State v. Fortune*, 2011 ME 125, 34 A.3d 115, where, in ¶ 30, the court notes the trial counsel's proposed

21

instructions that would have required the jury to find, beyond a reasonable doubt, that the elements of attempted murder were proved as to all three named victims in order to return a guilty verdict on Count VIII, saying that it was not in accordance with the law in Maine or the more generous general verdict jurisprudence articulated by the Supreme Court in *Griffin v. United States*, 502 U.S. 46, 112 S. Ct. 466, where, petitioner notes, the court says that his trial counsel could have proposed, but did not, that the jury be instructed that to support a conviction, the jury was required to be unanimous that the elements of attempted murder were proven as to at least one named victim. The actual instruction by the court was that "the State prove beyond a reasonable doubt the charge of attempted murder against one of the people named in that count, that would be sufficient so long as all the elements of attempted murder have been proven beyond a reasonable doubt by the State in the case." Applying the standard of the performance of a competent counsel to whatever discrepancy may be found between that suggested by the court to be given as an instruction and that specifically given by the trial justice, this court finds that the petitioner has no basis for complaint, as, in essence, whatever discrepancy may exist is harmless.

The Sixth Amendment to the United States Constitution and Article 1, Section 6 of the Maine Constitution ensure that a criminal defendant is entitled to receive the effective assistance of an attorney. *McGowen v. State*, 2006 ME 16,

22

894 A.2d 493, the purpose of effective assistance of counsel requirement is to ensure a fair trial. *Aldus v. State*, 2000 ME 47, 748 A.2d 463. An effective assistance of counsel claim requires the petitioner to demonstrate (1) that counsel's representation fell below an objective standard of reasonableness, and (2) a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668 (1984); *Kimball v. State*, 490 A.2d 653 (Me. 1985). In the context of post-conviction relief a "reasonable probability" means "a probability sufficient to undermine confidence in the outcome." (*Ibid.* at 694) The reasonable probability standard is less than preponderance of the evidence. *Nix v. Whiteside*, 457 U.S. 157 (1986); *Ferrara v. United States*, 456 F.3d 278 (1st Cir. 2006). The first is applied on a case by case basis, and evaluations of ineffective assistance of counsel claims are guided by the overall justness and fairness of the proceeding. *McGowen v. State*, 2006 ME 16, 894 A.2d at 497.

The underlying premise of Mr. Fortune's petition is that the performances of trial and appellate counsel were deficient and that those deficiencies prejudiced his defense. The standard for a determination of deficiency of counsel is *Strickland v. Washington*, 466 U.S. 668 (1984). Under the U.S. Constitution, the Sixth Amendment right to counsel exists and is needed in order to protect the fundamental right to a fair trial. The Constitution guarantees a fair trial through the

due process clauses, but defines the basic elements of a fair trial largely through the civil provisions of the Sixth Amendment including the counsel clause. *Strickland*, 466 U.S. at 684-85. The right to counsel is the right to the effective assistance of counsel. *Id.* at 686. The claim in question is that of actual ineffectiveness of counsel. The benchmark for judging any claim of ineffectiveness must be where the counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. *Id.* at 686. The Court defined that counsel's assistance was so defective as to require a reversal of a conviction and new trial, the petitioner must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires a showing that counsel's errors were so serious as to deprive the petitioner of a fair trial, a trial who's result is reliable. *Id.* at 687. To prevail the petitioner must show that counsel's representation fell below an objective standard of reasonableness. *Id.* at 688. The proper measure of attorney performance by the Sixth Amendment relies on the legal profession's maintenance of standards sufficient to justify the laws presumption that counsel will fulfill the role in the adversary process that the

24

amendment envisions. The proper measure of attorney performance remains simply remains reasonableness under prevailing professional norms. *Id.* at 688

The representation of a criminal defendant entails certain basic duties. Counsel function is to assist the defendant, and hence counsel owes the client a duty of loyalty, a duty to avoid conflicts of interest. Counsel must function as an assistant to the defendant including the overarching duty to advocate the defendant's cause and more particularly to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution. Counsel also has a duty to bear such skill and knowledge as will render the trial a reliable adversarial testing process. *Id.* at 688. The purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation but simply to ensure that criminal defendants receive a fair trial. *Id.* at 689. Scrutiny of counsel's performance must be highly deferential. A fair assessment of performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel perspective at the time. *Id.* at 689 A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must keep in mind that counsel's function is to make the adversarial testing process

25

work in the particular case. *Id.* at 690. The court must use a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, including what "might be considered sound trial strategy." *Id.* at 689.

An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. Again, the purpose of the Sixth Amendment guarantee is to ensure that the defendant has the assistance necessary to justify reliance in the outcome of the proceeding. *Id.* at 691-92.

The defendant must show that there is a reasonable probability that, but for counsel's unprofessional error, the results of the proceedings would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* at 694. The United States Supreme Court has made it clear that its decisions are not to establish mechanical rules. The principles enunciated guide the process of decision, but the ultimate focus of inquiry must be on the fundamental fairness of the proceeding who's result is being challenged. In any case, the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results. *Id.* at 696.

To prove ineffective assistance of counsel, defendant must show that counsel's representation fell below an objective standard of reasonableness. The question is whether counsel's performance fell within the wide range of reasonable professional assistance that a competent criminal defense counsel would provide after prevailing professional norms. The reviewing court is required to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. *Roberts v. State*, 2014 ME 125. The Maine Law Court has expressed a preference for beginning its analysis with the prejudice prong, reasoning that ". . . if it is determined that there was no prejudice, there is no need to address the first prong regarding whether counsel's performance was deficient." *McGowan v. State*, 2006 ME 16, 894 A.2d 493.

This reviewing court has examined the entire transcript of the trial and has researched the prevailing cases with respect to the issues of hearsay, the rule of completeness, and the Confrontation Clause. Contrary to petitioner's assertion, it is clear from the transcript that trial counsel made every effort to avoid the admission of the statement of allocution by Mr. Hylton, including but not limited to, her decision to not offer Hylton's letter of apology into evidence but to simply stand on the language that was admitted by the testimony of Mr. Hylton. From the point of view of prejudice to the defendant in considering whether there exists a reasonable probability that, but for the admission of the allocution transcript, the

27

result of the trial would have resulted in a non-guilty verdict, this court is not satisfied that such is the case. Regardless of the position of the defendant as evidenced by his testimony, it is clear that the jury could find that Mr. Fortune was present at the scene when Mr. Hylton was committing the assaults. His position that he was nearly a spectator facilitating the escape of Mr. Hylton from the premises is suspect where the testimony of a cell mate makes it clear that Mr. Fortune admits to participating in the attempted murders by holding down the father while Mr. Hylton was attacking the daughter. Further, his murderous intent is evidenced by his willingness to admit that had he seen the gun at the time, he would have used it to complete the effort. Trial counsel's masterful cross-examination of the cell mate/witness was nothing less than outstanding professional trial work. This court is satisfied that there was sufficient evidence even in the absence of the allocution transcript for a jury to find the defendant guilty beyond a reasonable doubt. Whatever prejudice that Mr. Fortune may have suffered by the reading of the transcript in light of all of the evidence contrary to the allocution narrative suggests that the prejudice was minimal almost to the point of being harmless.

*Strickland* also applies to the performance of appellate counsel. A petitioner must first show that his appellate counsel was objectively unreasonable in failing to find an arguable issue to appeal that would include whether counsel

28

unreasonably failed to discover a non-frivolous issue, but he must also show "a reasonable probability that, but for counsel's unprofessional error, the results of the proceeding would have been different." *Smith v. Robbins*, 528 U.S. 259 at 285. Appellate counsel who filed a merits brief need not (and should not) raise every non-frivolous claim, but rather may select from them in order to maximize the likelihood of success on appeal. Generally, only when ignored issues are clearly stronger than those presented will the presumption of effective assistance of counsel be overcome. *Id.* at 288 (citing *Gray v. Greer*, 800 F.2d 644, 646 (Calif. 7th Dist. 1986).

Generally, errors at trial that could have been raised on direct appeal may not be raised on an action for post-conviction review. 15 M.R.S. § 2128(1) (2013). However, the assertion of a right under the Constitution of the United States may not be held waived by its non-assertion at trial or on appeal if the assertion of the right would be held not waived in federal habeas corpus proceeding brought by the convicted or adjudicated person pursuant to [28 U.S.C.A. § 2241-2254] 15 M.R.S. § 2128-A (2013); *Roberts v. State*, 2014 ME 125.

This court is not satisfied that the exclusion of the transcript of the allocution of Mr. Hylton given during his sentencing likely would have resulted in a more favorable verdict for Mr. Fortune. However, this court is satisfied that the Confrontation Clause issue is as strong if not stronger for appellate review than

those presented by appellate counsel. In that regard, appellate counsel was deficient in failing to present it to the Law Court and was obligated to do so in spite of his reluctance to address an obvious error standard. "Obvious error" is plain error that affects substantial rights that has been forfeited at trial and "seriously affects the fairness, integrity or public reputation of judicial proceedings." *State v. Burdick,* 2001 ME 143. This can only be tested by the appropriate appellate tribunal.

The court is not satisfied this rises to the level of inadequate appellate representation. Further, having been raised as a proper habeas corpus issue in this proceeding, Mr. Fortune is entitled to an appeal on that very issue.

For reasons articulated herein, the entry will be:

The petition for relief is DENIED.

DATED: 12-23-15

DONALD H. MARDEN
Superior Court Justice

DANIEL L FORTUNE
  vs
STATE OF MAINE

SUPERIOR COURT
KENNEBEC, ss.
Docket No  AUGSC-CR-2014-00056

**DOCKET RECORD**

PL. DOB: 11/01/1987
PL. ATTY: HUNTER TZOVARRAS                    State's Attorney: JAMES MITCHELL
          LAW OFFICE OF HUNTER J TZOVARRAS
          PO BOX 391
          HAMPDEN ME 04444
          APPOINTED 09/25/2012

Filing Document: PETITION                Major Case Type: POST CONVICTION REVIEW
Filing Date: 08/16/2012

## Charge(s)

## Docket Events:

01/14/2014 FILING DOCUMENT -  PETITION FILED ON 08/16/2012

          MOTION -  MOTION FOR APPOINTMENT OF CNSL FILED BY DEFENDANT ON 08/16/2012

          ALONG WITH CERTIFICATE (TO BE COMPLETED BY THE INSTITUTION FOR PRISONERS, TO BE USED IN
          CIVIL AND CRIMINAL CASES)
          MOTION -  MOTION FOR APPOINTMENT OF CNSL GRANTED ON 09/25/2012
          JOHN  NIVISON , JUSTICE
          COPY TO PARTIES/COUNSEL
          POST CONVIC. REVIEW -  REVIEW SENT FOR REVIEW ON 08/23/2012
          WILLIAM R ANDERSON , JUSTICE
          AT PENOBSCOT JUDICIAL CENTER, 78 EXCHANGE ST SUITE 350, BANGOR, ME.   04401
          POST CONVIC. REVIEW -  ASSIGNMENT ASSIGNED TO DOCKET ON 09/17/2012
          WILLIAM R ANDERSON , JUSTICE
          POST-CONVICTION ASSIGNMENT ORDER FILED AND INCORPORATED HEREIN BY REFERENCE; CASE ASSIGNED
          TO THE REGULAR CRIMINAL DOCKET; COUNSEL TO BE APPOINTED; TIME LIMITS ESTABLISHED.
          ORDER -  SPECIAL ASSIGNMENT ENTERED ON 09/19/2012
          THOMAS E HUMPHREY , SUPERIOR COURT CHIEF JUSTICE
          IT IS HEREBY ORDERED THAT JSUTICE M. MICHAELA MURPHY IS HEREBY ASSIGNED TO HEAR AND
          DISPOSE OF ALL MATTERS THAT MAY ARISE IN CONNECTION WITH THIS CASE.  THIS CLERK IS
          DIRECTED TO INCORPORATE THIS ORDER INTO THE DOCKET BY REFERENCE PURSUANT TO M.R. CIV. P.
          (A).
01/14/2014 Party(s):  DANIEL L FORTUNE
          ATTORNEY -  APPOINTED ORDERED ON 09/25/2012

          Attorney:  HUNTER TZOVARRAS
          MOTION -  MOTION FOR ENLARGEMENT OF TIME FILED BY DEFENDANT ON 10/22/2012

          TO FILE AMENDED PETITION
          MOTION -  MOTION FOR ENLARGEMENT OF TIME GRANTED ON 10/29/2012
          M MICHAELA MURPHY , JUSTICE
          COPY TO PARTIES/COUNSEL

                                                    PETITIONER HAS UNTIL 2/1/13 TO
          FILE AN AMENDED PETITION FOR PCR
          MOTION -  MOTION FOR ENLARGEMENT OF TIME GRANTED ON 02/12/2013
          M MICHAELA MURPHY , JUSTICE

COPY TO PARTIES/COUNSEL
MOTION -  MOTION FOR ENLARGEMENT OF TIME FILED BY PETITIONER ON 01/18/2013


Attorney:  HUNTER TZOVARRAS
ADDITIONAL TIME REQUESTED TO FILE AMENDED PETITION
MOTION -  MOTION FOR EXTENSION OF TIME FILED BY PETITIONER ON 05/14/2013


MOTION -  MOTION FOR EXTENSION OF TIME MOOT ON 08/29/2013
M MICHAELA MURPHY , JUSTICE
MOTION -  MOTION FOR ENLARGEMENT OF TIME GRANTED ON 08/29/2013
M MICHAELA MURPHY , JUSTICE
COPY TO PARTIES/COUNSEL
MOTION -  MOTION FOR ENLARGEMENT OF TIME FILED BY PETITIONER ON 08/28/2013


SUPPLEMENTAL FILING -  AMENDED PETITION FILED ON 10/25/2013


POST CONVIC. REVIEW -  RESPONSE TO PETITION FILED ON 11/07/2013


Attorney:  FERNAND LAROCHELLE
MOTION -  MOTION TO TRANSFER FILED BY STATE ON 11/08/2013

01/22/2014 POST CONVIC. REVIEW -  ASSIGNMENT ASSIGNED TO JUSTICE ON 09/19/2012
          M MICHAELA MURPHY , JUSTICE
01/31/2014 POST CONVIC. REVIEW -  PCR CONFERENCE SCHEDULED FOR 02/14/2014 at 08:30 a.m.


01/31/2014 POST CONVIC. REVIEW -  PCR CONFERENCE NOTICE SENT ON 01/31/2014


02/14/2014 MOTION -  OTHER MOTION FILED BY STATE ON 02/14/2014


          DA:  FERNAND LAROCHELLE
          MOTION WITH PROPOSED ORDER
02/27/2014 POST CONVIC. REVIEW -  PCR CONFERENCE HELD ON 02/14/2014
          M MICHAELA MURPHY , JUSTICE
          Attorney:  HUNTER TZOVARRAS
          DA:  FERNAND LAROCHELLE
          Defendant Not Present in Court
02/27/2014 POST CONVIC. REVIEW -  ORDER RESULTING FROM PCR CONF FILED ON 02/14/2014
          M MICHAELA MURPHY , JUSTICE
          EVIDENTIARY HEARING TO BE SCHEDULED IN SEPTEMBER 2014, 1 DAY, PARTIES TO FILE WITNESS LIST
          30 DAYS BEFORE TRIAL/HEARING                          COPIES SENT TO PARTIES
02/27/2014 HEARING -  EVIDENTIARY HEARING SCHEDULED FOR 11/13/2014 at 08:30 a.m.
          M MICHAELA MURPHY , JUSTICE
          NOTICE TO PARTIES/COUNSEL
02/27/2014 HEARING -  EVIDENTIARY HEARING NOTICE SENT ON 02/27/2014


02/27/2014 WRIT -  HABEAS CORPUS TO PROSECUTE ISSUED ON 02/27/2014


          CERTIFIED COPY TO SHERIFF DEPT.
03/18/2014 MOTION -  MOTION FOR DISCOVERY FILED BY DEFENDANT ON 03/06/2014


          Attorney:  HUNTER TZOVARRAS
03/18/2014 MOTION -  OTHER MOTION GRANTED ON 03/09/2014
          M MICHAELA MURPHY , JUSTICE

MOTION WITH PROPOSED ORDER
03/21/2014 MOTION - MOTION FOR DISCOVERY GRANTED ON 03/19/2014
M MICHAELA MURPHY , JUSTICE
COPY TO PARTIES/COUNSEL
10/11/2014 OTHER FILING - WITNESS LIST FILED BY STATE ON 09/30/2014

DA: FERNAND LAROCHELLE
10/11/2014 OTHER FILING - WITNESS LIST FILED BY STATE ON 10/02/2014

DA: FERNAND LAROCHELLE
SUPPLEMENTAL WITNESS LIST
10/30/2014 OTHER FILING - TRANSCRIPT FILED ON 10/30/2014

Reporter: TAMMY DROUIN
RULE 11 TRANSCRIPT
11/05/2014 MOTION - MOTION TO RECUSE FILED BY DEFENDANT ON 11/05/2014

11/05/2014 HEARING - EVIDENTIARY HEARING CONTINUED ON 11/05/2014

12/22/2014 MOTION - MOTION FOR ENLARGEMENT OF TIME FILED BY PETITIONER ON 12/22/2014

Attorney: HUNTER TZOVARRAS
PETITIONER'S MOTION FOR ENLARGEMENT OF TIME TO FILE POST-HEARING MEMORANDUM
12/22/2014 OTHER FILING - MEMORANDUM OF LAW FILED ON 12/22/2014

Attorney: HUNTER TZOVARRAS
PETITIONER'S MEMORANDUM IN SUPPORT OF POST CONVICTION RELIEF
12/22/2014 HEARING - EVIDENTIARY HEARING SCHEDULED FOR 11/13/2014 at 08:30 a.m.

NOTICE TO PARTIES/COUNSEL
12/22/2014 HEARING - EVIDENTIARY HEARING HELD ON 11/13/2014
DONALD H MARDEN , JUSTICE
Attorney: HUNTER TZOVARRAS
DA: FERNAND LAROCHELLE
Defendant Present in Court
12/22/2014 CASE STATUS - DECISION UNDER ADVISEMENT ON 11/13/2014
DONALD H MARDEN , JUSTICE
12/24/2014 MOTION - MOTION FOR ENLARGEMENT OF TIME GRANTED ON 12/22/2014
DONALD H MARDEN , JUSTICE
COPY TO PARTIES/COUNSEL
01/12/2015 OTHER FILING - MEMORANDUM OF LAW FILED ON 01/12/2015

DA: FERNAND LAROCHELLE
02/05/2015 OTHER FILING - MEMORANDUM OF LAW FILED ON 01/29/2015

Attorney: HUNTER TZOVARRAS
PETITIONER'S REPLY TO RESPONDENT'S POST HEARING MEMORANDUM
12/24/2015 MOTION - MOTION TO RECUSE GRANTED ON 11/06/2014
M MICHAELA MURPHY , JUSTICE
COPY TO PARTIES/COUNSEL                                    GRANTED. CHIEF
JUSTICE HUMPHREY SHALL RE-ASSIGN TO DIFFERENT JUSTICE
12/24/2015 MOTION - MOTION TO TRANSFER GRANTED ON 04/16/2015
DONALD H MARDEN , JUSTICE

COPY TO PARTIES/COUNSEL
12/24/2015 ORDER - COURT ORDER ENTERED ON 12/23/2015
DONALD H MARDEN , JUSTICE
THE PETITION FOR RELIEF IS DENIED
12/24/2015 FINDING - DENIED ENTERED BY COURT ON 12/24/2015


A TRUE COPY
ATTEST: _____
                              Clerk